**George Gordon LIDDY, Appellant**

**and**

**Frances Purcell Liddy, Plaintiff,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**No. 86–1050.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 7, 1986.

Decided Dec. 23, 1986.

Paul S. Richter (Kelley A. Finn, Richter, Alexander & Widder; Roger V. Barth; Curtis, Mallet-Prevost, Colt & Mosle, Washington, D.C., on brief), for appellant.

Francis Allegra, Tax Div., Dept. of Justice (Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup, Tax Div., Dept. of Justice; Gilbert S. Rothenberg, Tax Div., Dept. of Justice, Washington, D.C., on brief), for appellee.

Before WINTER, Chief Judge, and WILKINSON and WILKINS, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

George Gordon Liddy appeals from the judgment of the Tax Court ruling him liable for income taxes on his conceded receipt of $45,630 in 1972 as director of an intelligence operation, the purpose of which was to acquire information on the capabilities and intentions of the prospective Democratic opponents to then President Richard M. Nixon. The Tax Court also ruled that Mrs. Liddy was an "innocent spouse" under the provisions of 26 U.S.C. § 6013(e) and therefore was not jointly liable with her husband even though the two of them had filed a joint return, and that Mr. Liddy was not liable for an addition to the tax under 26 U.S.C. § 6653(b) since it was not proved that he intended to evade taxes. *See* George Gordon Liddy and Frances Purcell Liddy v. Commissioner of Internal Revenue, T.C. Memo, 1985–107 (March 11, 1985). These latter two rulings are not at issue in this appeal.

Liddy appeals and we affirm.

## I.

The Tax Court made full and complete findings which are not contested and which need not be repeated at length. It suffices to say that Liddy testified that as director of the intelligence operation, disguised as general counsel to the Committee to Re-Elect the President (CREEP) from December 1971 to April 1972 and thereafter as general counsel to the Finance Committee to Re-Elect the President (FCREEP), he received in cash in 1972 the total sum of $386,000. These funds were to be used to recruit personnel, acquire the necessary surveillance equipment and organize the intelligence activities. At first Liddy was required to account for all funds that he received. Later he was neither required to acknowledge receipt of the money nor to justify expenditures. He did, however, keep receipts of the expenditures made in furtherance of intelligence activities.

The surveillance operation ceased shortly after the June 1972 Watergate break-in, which was discovered while still in progress. Liddy then destroyed all of the records in his possession with respect to the intelligence operation and recommended to one of his superiors that he do the same. After the Watergate break-in was discovered, Liddy was arrested and prosecuted for various offenses. He was convicted of several offenses, sentenced to imprisonment and fined. Subsequently his sentence was commuted but his fine was not reduced.

In filing his income tax return for 1972, Liddy reported as income none of the monies he had received for the illegal endeavor except the salary he was paid. IRS determined that during 1972, in addition to his salary, Liddy had received $374,300 from FCREEP and various persons, that only $197,500 had been disbursed on behalf of FCREEP, and that the balance of $176,800 was taxable income. On this amount the Commission made a deficiency assessment of $103,532.52 and imposed a fraud penalty of $51,766.26.

Liddy then petitioned the Tax Court for review of the assessment; after trial, it held that Liddy had received the sum of $386,000 and that $340,370 of the funds received by Liddy were in fact expended in furtherance of intelligence operations. It reduced the deficiency in unreported income to $45,630, excusing the fraud penalty and the liability of Mrs. Liddy. Although the Tax Court found Liddy to be a credible witness generally—and the government adduced no affirmative evidence that Liddy had diverted the funds to his personal use by showing an increase in net worth or otherwise—it ruled that Liddy had not carried his burden of proving that the $45,630 entrusted to him had been expended for intelligence activities. The Tax Court therefore concluded that this amount was diverted for personal use and constituted personal income.

## II.

■ We start with the conceded fact that Liddy received the $45,630 in question. It is well-settled that a taxpayer who receives monies under a claim of right and without restrictions as to its disposition must include such monies in gross income even though he may be liable for its return. *James v. United States,* 366 U.S. 213, 219, 81 S.Ct. 1052, 1055, 6 L.Ed.2d 246 (1961); *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932). Only if the taxpayer can show that he has no claim of right by reason of a requirement to make prompt payments of amounts received even if such payments are made in the absence of an enforceable obligation, or that he is acting as a mere agent or conduit, is the receipt of monies not deemed gross income. *Lashells' Estate v. Commissioner,* 208 F.2d 430, 435 (6 Cir.1953); *Goodwin v. Commissioner,* 73 T.C. 215, 230 (1979); *Diamond v. Commissioner,* 56 T.C. 530, 541 (1971), *aff'd,* 492 F.2d 286 (7 Cir.1974).

■ A determination by the Commissioner that funds have been appropriated for personal use is presumptively correct. *Faulconer v. Commissioner,* 748 F.2d 890, 893 (4 Cir.1984); *Potito v. Commissioner,*

534 F.2d 49, 51 (5 Cir.1976), *cert. denied,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 751 (1977); *Biltmore Homes, Inc. v. Commissioner,* 288 F.2d 336, 339 (4 Cir.1961), *cert. denied,* 368 U.S. 825, 82 S.Ct. 46, 7 L.Ed.2d 30 (1961). The burden of overcoming this presumption rests on the taxpayer. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Faulconer v. Commissioner, supra.*

Liddy undertook to meet his burden solely by his own testimony, but the Tax Court held the testimony insufficient to carry the burden with respect to the $45,630. With regard to $340,370, Liddy testified that he acted simply as a conduit in receiving and disbursing these funds. He, however, explained the balance only as follows:

Q. Did you spend all of the funds you have discussed on approved committee purposes?

A. All the funds that I expended were expended for approved committee purposes, yes. I didn't expend all the funds as I just told you.

Q. You're referring to the amount that was left over.

A. Left over, yes.

Q. That you just described.

A. *Some* of that amount was subsequently expended, too, for committee purposes.

Q. Did you divert any of these funds to your own personal use?

A. No, sir.

Q. Did you spend any for your personal use?

A. No, sir. (emphasis added).

We note from this testimony that while Liddy disclaimed any personal use or benefit from the remaining money, he testified that only "some", an undetermined amount, was spent for committee purposes and he offered no explanation of what happened to the balance. We are thus constrained to hold that to the extent that the finding of the Tax Court that Liddy's testimony was "insufficient to carry his burden" of rebutting the presumption of correctness of the Commissioner's determination is a finding of fact, the finding is not clearly erroneous. If treated as a conclusion of law, we think also that the conclusion was correct.

Our dissenting brother reads this testimony as applying only to a portion of the $11–12,000 remaining in Liddy's office safe after the Watergate break-in was discovered. We concede that the record is not crystal-clear and our brother's construction may be correct, although we think it significant that during oral argument when Liddy's counsel was interrogated about this testimony, it having been read to him, he offered no such explanation as that now advanced by Judge Wilkins.

■ In any event, the fact remains that except for a general denial that he or his family derived personal benefit from the funds, Liddy was unable to explain what happened to $45,630. At most, there was only vague and uncertain testimony of Liddy which could have been verified (or disproved) had Liddy not destroyed the supporting documentation. *Laney v. Commissioner,* 674 F.2d 342, 349–50 (5 Cir.1982) (general denial of receipt of income insufficient to satisfy taxpayer's burden of proof); *Geiger v. Commissioner,* 440 F.2d 688, 690 (9 Cir.1971), *cert. denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 90 (1971) (same); *Sharwell v. Commissioner,* 419 F.2d 1057, 1060 (6 Cir.1969) (same). These authorities establish that Liddy's evidence was insufficient as a matter of law to rebut the presumption of correctness of the Commissioner's determination of a deficiency. We too hold that a general denial of personal benefit uncorroborated by documentary evidence which was once available is insufficient to carry the taxpayer's burden of overcoming the presumption of correctness of the Commissioner's determination with respect to funds which the taxpayer concedes that he received even though generally he has been found to be a credible witness.

Liddy argues, in reliance on *Demkowicz v. Commissioner,* 551 F.2d 929 (3 Cir.

1977), that, having been found generally to be a credible witness, this was enough to entitle him to prevail. We disagree.

In *Demkowicz*, the taxpayer was the principal stockholder of a corporation engaged in the construction business which bore his name—Walter Demkowicz, Inc. (W.D., Inc.). W.D., Inc. constructed and owned a building in Elizabeth, New Jersey, which was subject to a first mortgage. W.D., Inc. then borrowed $54,000 from a private lender, David Checinski, and gave him a second mortgage on the property. The proceeds of the loan were deposited in W.D., Inc.'s bank account. The Commissioner made a deficiency assessment against taxpayer and his wife asserting that the proceeds of the Checinski loan were diverted to taxpayer's personal use and thus were taxable to him as dividend income. When the taxpayer contested the assessment in the Tax Court, he offered documentary proof in the form of a monthly bank statement to show that all but a few hundred dollars of the Checinski loan had been disbursed, and he testified that the disbursements were to pay the corporate debts of W.D., Inc., incurred in the construction of a building, and that he never personally used any of the proceeds. While the Tax Court upheld the Commissioner's determination, the Court of Appeals reversed. It held that:

> By his unequivocal denial that he received any personal benefit from the Checinski loan proceeds, and by his assertion that the proceeds were used by W.D., Inc., to satisfy debts incurred in the construction of a building, taxpayer overcame the presumption of correctness which arises from the Commissioner's determination. Furthermore, since the Commissioner offered no evidence to support the deficiency assessment, taxpayer's testimony was sufficient to meet his ultimate burden of proving the incorrectness of the Commissioner's determination, unless it was rejected by the Tax Court as being improbable, unreasonable or questionable.

551 F.2d at 931, n. 6. Later in the opinion, the Court of Appeals also addressed the reliance by the Tax Court on the taxpayer's lack of proof of identity of the persons to whom W.D., Inc. paid the proceeds of the loan to support the result reached by the Tax Court, saying:

> We do not believe [that the failure to identify payees] either explicitly or implicitly rejects taxpayer's testimony that he did not divert the proceeds of the Checinski loan to his personal use and that the proceeds were used by W.D., Inc., to satisfy construction debts.

551 F.2d at 932.

From this précis, we think it manifest that *Demkowicz* turned on the proof as to whether the taxpayer received the funds which the Commissioner determined was income to him. The case thus differs from the instant case, and the difference renders *Demkowicz* distinguishable. Here it is conceded that Liddy received the funds which are charged to him. Here the issue is whether Liddy could satisfactorily explain the expenditure of funds which he admits he possessed.

We are not alone in reading *Demkowicz* to be limited to the rare case where the Commissioner asserted the receipt of monies, denied by the taxpayer, unsupported by any other proof. This is the reading given it by the Fifth Circuit in *Laney v. Commissioner of Internal Revenue*, 674 F.2d 342, 350 (5 Cir.1982). We are constrained to agree with the Fifth Circuit also that a broader reading of *Demkowicz* "effectively guts the *Welch* [*Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933)] burden ... [s]ince the taxpayer will always—absent some suicidal tendencies or masochistic desire to pay taxes he argues are not due—give such testimony ...." *Id.* at 350.

Finally, we think that when the Tax Court credited Liddy's testimony with regard to the $340,370 by which it reduced the Commissioner's determination of a deficiency, it was not foreclosed from reaching a contrary conclusion with respect to the $45,630 balance. *Foster v. Commissioner*, 391 F.2d 727, 735–36 (4 Cir.1968).

For these reasons and those assigned by the Tax Court, its judgment is

AFFIRMED.

WILKINS, Circuit Judge, dissenting:

The Tax Court found the taxpayer's testimony to be credible and believable. Then, notwithstanding the fact that the Commissioner of Internal Revenue (Commissioner) presented no contradictory evidence, it ruled against the taxpayer. I would follow the rationale of *Demkowicz v. Commissioner*, 551 F.2d 929 (3rd Cir.1977) and reverse.

## I.

At trial Liddy testified that in 1972 he received $386,000.00 from his employers for use in political intelligence operations. This was $11,700.00 more than the $374,-300.00 the Commissioner originally claimed he had received. Liddy initially obtained cash from Bart Porter, who required him to acknowledge receipt of the money in writing. He made expenditures and returned the remaining cash, with receipts for the disbursements, to Porter in a sealed envelope. He also received cash from Hugh Sloan, who did not require him to acknowledge receipt or justify expenditures. Nevertheless, Liddy did keep detailed records of the receipt and disbursement of the money given him by Sloan. Liddy testified that when the Watergate activities were discovered, he destroyed all of his records.

Appearing before the Tax Court in 1983, over ten years after the fact, Liddy was able to recall the manner in which he disbursed $340,370.00. He could not specifically account for the expenditure of the remaining $45,630.00, but he unequivocally testified that none of the $386,000.00 was diverted to his personal use.

I.R.S. Agent John Stanley testified he had no knowledge of any diversion of funds by Liddy, he had not spoken with anyone during his investigation who indicated Liddy had diverted funds to his personal use, and he had never seen any documents evidencing Liddy had diverted funds to his personal use. Moreover, the Commissioner stipulated in writing that he had "no specific knowledge, information or evidence that either petitioner [1] maintained a life style, mode or standard of living in excess of that which would be appropriate to the income reported on their 1972 tax return."

The Tax Court made the following critical finding:

> Although we obviously do not condone petitioner's involvement in illegal activities, we found him to be a credible witness with respect to the issue at hand. He was frank in describing how he obtained the funds for the intelligence operation, and was able to give a reasonably detailed accounting regarding most of his expenditures. In a rather odd twist, petitioner's testimony was all the more believable and plausible by reason of his bizarre view of right and wrong. Simply put, the old adage, the end justifies the means, seems a fair description of his approach to life.

It further found that it was "plausible" that Liddy would have destroyed all political intelligence records in his possession once the Watergate activities were discovered. The Tax Court also noted that Liddy's financial records for the year in question showed no unusual or large deposits or transactions. Nevertheless, it ruled:

> He was not able, however, to explain adequately what he did with the other $45,630 in funds that he received. His general statement that these funds were also expended is insufficient to carry his burden, and we therefore find that this amount was diverted by him for his personal use and thus constitutes income.

The Tax Court assessed Liddy an additional income tax of $20,449.00 but declined

---

**1.** As the majority points out, Liddy's wife was found to be an innocent spouse under the provisions of 26 U.S.C.A. § 6013(e).

to impose the fraud penalty sought by the Commissioner.

## II.

The law is well settled that the Commissioner's notice of deficiency carries a presumption of correctness. When contesting the deficiency, the ultimate burden of proof rests with the taxpayer. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Applying the rationale of *Demkowicz v. Commissioner*, 551 F.2d 929 (3rd Cir.1977) to the present facts will violate neither of these principles.

In *Demkowicz* the Commissioner determined that the taxpayer diverted to his personal use the proceeds of a loan made to a corporation of which he was the principal stockholder. The taxpayer testified that the loan proceeds were used only to satisfy corporate debts and that no proceeds were diverted to his personal benefit. As in the present case, the Commissioner presented no evidence to contradict the taxpayer's testimony. The Tax Court upheld the determination of the Commissioner. The Court of Appeals for the Third Circuit reversed. It held that the taxpayer's testimony overcame the presumption of correctness, *Demkowicz*, 551 F.2d at 931, and the burden of going forward then shifted to the Commissioner, requiring him to present evidence supporting the notice of deficiency. As the Commissioner elected to present no evidence, the Third Circuit held that the taxpayer's testimony was sufficient to meet his burden of proof since it was not found to be "improbable, unreasonable or questionable." *Demkowicz, id.*

I do not construe *Demkowicz* to hold that a taxpayer's uncontradicted testimony alone is always sufficient to rebut the presumption of correctness. Merely offering testimony which is uncontradicted is not sufficient. If, for whatever reason, it is judged by the trier of fact to be incredible, unreasonable, improbable or even self-serving to the point of being questionable, then it is insufficient to rebut the presumption of correctness. *See Geiger v. Commissioner*, 440 F.2d 688, 689–90 (9th Cir.), *cert.*

*denied,* 404 U.S. 851, 92 S.Ct. 88, 30 L.Ed.2d 90 (1971) (uncontradicted evidence from taxpayer does not necessarily operate to overcome the presumption of correctness). On the other hand, if the testimony of the taxpayer is found to be credible, reasonable and worthy of belief, then it defeats the presumption of correctness. If the Commissioner elects to present no contradictory evidence, then the testimony also serves to satisfy the ultimate burden of proof.

The majority attempts to distinguish *Demkowicz* by asserting that it dealt with the issue of whether the taxpayer had received funds, while Liddy acknowledged receipt of the money. However, nothing in *Demkowicz* indicates that the taxpayer's receipt of funds was disputed. The fundamental issue was whether the taxpayer expended the proceeds of a loan made to his corporation—proceeds within his dominion and control—for corporate purposes or whether he diverted the proceeds to his personal benefit. This is the identical question here.

The Commissioner incorrectly argues that *Demkowicz* should not be followed because it effectively abrogates the burden of proof placed upon the taxpayer by *Welch v. Helvering*, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212 (1933). He misreads *Demkowicz* for it does not shift the ultimate burden of proof to the Commissioner in violation of Supreme Court precedent. It merely establishes what I consider to be the appropriate method by which a taxpayer may meet his burden on a limited set of facts.

## III.

Liddy unequivocally testified that none of the funds were diverted to his personal use. The Tax Court expressly found Liddy to be a credible and believable witness. It also recognized the absence of any nexus between the destruction of records and an attempt to avoid income tax. Furthermore, as conceded by the Commissioner's stipulation, there was no evidence, either in Liddy's financial records or otherwise, to indi-

cate that he utilized any money, other than that reported on his tax return, for his personal benefit. The record also reflects that Liddy's family was in dire financial straits following his incarceration.

As found by the Tax Court, Liddy explained the disbursement of several hundred thousands of dollars through credible and believable testimony. If he had been willing to offer false testimony, how easy it would have been to conceal the $45,630.00 by merely adding a few thousand dollars to various categories about which he testified. Among others, a prime category for artificial inflation was "shredded cash," a category to which Liddy attributed only $1,300.00 and which the Tax Court accepted as a true fact. Also, he candidly admitted receiving and disbursing $11,700.00 more than the Commissioner believed he had received.

The majority focuses on a statement taken from Liddy's testimony, "Some of that amount was subsequently expended, too, for committee purposes," concluding that this represents an admission by Liddy that only "some" of the $45,630.00 in question was expended for committee purposes. When taken in proper context, however, it is clear that this testimony is referring not to the $45,630.00, but to several thousand dollars in his office safe at the time the Watergate break-in was discovered, some of which was expended and the balance given to Fred LaRue.

At the beginning of the excerpt quoted by the majority, Liddy stated "I didn't expend all the funds *as I just told you.*" (Emphasis added.) Liddy was referring to preceding testimony concerning $11,000.00 to $12,000.00 in committee funds which remained in his office safe when the break-in was discovered. Liddy testified that sometime after the break-in he was fired by Fred LaRue. He testified that at this time he turned over all committee funds then in his safe, a balance of $8,500.00, to LaRue. The Tax Court accepted as a fact that LaRue received the $8,500.00. When Liddy testified "Some of that amount was subsequently expended, too, for committee purposes," he was referring to $2,500.00 to $3,500.00 taken from the safe and expend-

ed for committee purposes between the time of the break-in and the time he was fired. In other words, "some" of the $11,000.00 to $12,000.00 "left over" in the safe was expended for committee purposes, and the balance of $8,500.00 was not expended, but given to LaRue.

In the testimony immediately following this, Liddy was not asked nor did he explain how he disbursed the $2,500.00 to $3,500.00 following the break-in discovery. However, in reply testimony he stated that $1,000.00 of this remaining amount was given to Howard Hunt, who was hiding in California, and $500.00 was paid to Hunt's attorney, Morton Jackson. The Tax Court accepted as a fact that these expenditures were made. While Liddy did not explain the disbursement of the remaining $1,000.00 to $2,000.00 in detail, he expressly testified none of it was diverted to his personal use.

### IV.

The express finding by the Tax Court that Liddy's testimony was credible, reasonable, believable and plausible rebutted the presumption of correctness. This testimony ultimately met his burden of proof since no contradictory evidence was offered by the Commissioner.

I therefore respectfully dissent.