MASATO AND HIROKO ISHIJIMA, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ishijima v. Commissioner
Docket Nos. 27713-91, 10832-92
United States Tax Court
T.C. Memo 1994-353; 1994 Tax Ct. Memo LEXIS 351; 68 T.C.M. (CCH) 231; July 26, 1994, Filed *351 Decision will be entered under Rule 155 at docket No. 27713-91. Decision will be entered for petitioners at docket No. 10832-92. Masato and Hiroko Ishijima, pro se. For respondent: Louis B. Jack and Roy Wulf. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income tax liabilities as follows: Additions to Tax
Sec.
Sec.
Year
Deficiency
6653(b)(1)
6653(b)(1)(A)
Docket No. 10832-92
Masato Ishijima
1983
$ 1,365,198
$   682,599
--
1984
1,504,093
752,047
--
Masato and Hiroko Ishijima
1985
2,753,115
1,376,558
--
Docket No. 27713-91
1987
757,007
--
$ 567,755
Additions to Tax
Sec.
Sec.
Sec.
Year
6653(b)(1)(B)
6653(b)(2)
6661
50 percent of the
interest due on --
Docket No. 10832-92
Masato Ishijima
1983
--
$ 1,365,198
$ 341,300
1984
--
1,504,093
376,023
Masato and Hiroko Ishijima
1985
--
2,753,115
688,279
Docket No. 27713-91
1987
$ 757,007
--
189,252
As an alternative to the additions to tax for fraud in each year, respondent determined that petitioners were liable for the additions to tax for negligence. *352 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are whether petitioners' income tax liability for each year in issue was understated due to fraud on the part of Masato Ishijima (petitioner); whether the statute of limitations bars assessment of liabilities for 1983, 1984, or 1985; and whether petitioners are liable for income taxes and additions to tax on the value of property received by them in 1987 in settlement of a dispute with petitioner's employer. FINDINGS OF FACT Some of the facts have been stipulated. Petitioners were at all times citizens of Japan and were residents of California at the time they filed their petitions. Petitioner began working for Nihon Radiator Co., Ltd. (Nihon Radiator), a Japanese corporation, in 1972. From 1972 through 1981, petitioner held a number of different accounting positions with Nihon Radiator in Japan. Petitioner is well educated, intelligent, and perceptive. He speaks and understands English, although trial of these cases was conducted through a Japanese interpreter *353 so that he could understand the proceedings and be understood by respondent's counsel, the Court reporter, and the Court. Calsonic, Inc. (Calsonic), a California corporation, was a subsidiary of Nihon Radiator that manufactured air conditioners for use in Nissan automobiles. On March 1, 1981, petitioner arrived in the United States to assume the position of manager of accounting and finance for Calsonic. Thereafter, petitioner was promoted to treasurer/controller of Calsonic, a position he held until 1986. He also held the position of deputy general manager of Calsonic. Petitioner reported to Kentaro Arai (Arai), the president of Calsonic. Arai was a member of the Nihon Radiator board of directors and manager of the marketing and sales department of Nihon Radiator. He was also director of joint ventures in the United States. Arai owned a home in Tennessee and spent part of his time in the United States. During the years in issue, Arai spent about two-thirds of his time in Japan. From the inception of Calsonic in the early 1970's and until 1983, Harry S. Fukuwa (Fukuwa) served as Calsonic's outside accountant, preparing unaudited financial statements for the company and assisting *354 the Japanese staff with their State and Federal income tax returns. Fukuwa also assisted Arai in making investments in the United States. Peat Marwick Mitchell (Peat Marwick) became Calsonic's outside accountant in 1983. Fukuwa continued as a consultant to Calsonic, assisting the company in U.S. real estate acquisitions, until 1986. Petitioner and Hiroko Ishijima (Mrs. Ishijima) were married on March 1, 1983, in Japan and again on April 30, 1983, in California. Arai acted as a "go-between" or "middleman" in relation to petitioners' marriage. After their wedding, petitioners resided in Irvine, California. In late May or early June 1983, Mrs. Ishijima became ill and returned to Japan to stay with her parents. On July 25, 1983, petitioners were divorced pursuant to Japanese law. The divorce was arranged by Arai. Mrs. Ishijima was hospitalized in Japan in December 1983, after attempting suicide. She remained in the hospital for 7 months and returned to the United States in July 1984. In October 1984, Mrs. Ishijima resumed living with petitioner. Petitioners thereafter represented themselves as married. Petitioners were remarried pursuant to Japanese law in January 1986. *355 Petitioners remained married and were living together through trial of these cases in 1993. Mrs. Ishijima has frequently been hospitalized and suffers severe health problems. In 1983, petitioner requested tax advice from Fukuwa on how to structure an offshore company. Fukuwa referred petitioner to a tax attorney, Robert Nagata (Nagata). Nagata was advised that the funds to be invested were received from petitioner's father in Japan. Nagata wrote a letter to Fukuwa outlining alternative ways to structure investment activities. Nagata discussed the alternatives personally with petitioner and Fukuwa. Thereafter, petitioner, Fukuwa, and Nagata established three entities: Yacranda International, N.V., a Netherlands Antilles corporation (Yacranda); C.I. Trust, a Cayman Islands trust, which would own Yacranda; and Jacranda International, Inc. (Jacranda), a California corporation, which would handle investments in the United States. The C.I. Trust was established with petitioner's father as the trustor and with petitioner and his brother and sister as beneficiaries. As of 1984, the C.I. Trust held 100 percent of the stock of Yacranda. Yacranda held 30 percent of the outstanding *356 stock of Jacranda. The balance of outstanding stock of Jacranda was held 40 percent by petitioner, 10 percent by Ko Ishijima, and 20 percent by Fukuwa. Fukuwa was Jacranda's president, petitioner was its chief financial officer, and both were directors. Gibraltar Cultural Division Y.N.V. (Gibraltar) was created as a division of Yacranda. A bank account at Union Bank was opened in the name of Gibraltar. Petitioner and Fukuwa were signatories on this account. During 1983 through 1986, Calsonic maintained an account (the Calsonic general account) at Mitsubishi Bank of California in Los Angeles, California. Petitioner was a signatory on the account. During 1983, petitioner maintained an account (the Masato account) at Mitsubishi Bank of California in Gardena, California. Petitioner was the sole signatory on this account. Yacranda and Gibraltar each maintained an account at Union Bank (the Yacranda clearing account and the Gibraltar account). Petitioner and Fukuwa were signatories on these two accounts. In 1983, two checks totaling $ 575,000 were written on the Calsonic general account to Mitsubishi Bank of California and deposited in the Masato account, and five checks totaling *357 $ 2 million were drawn on the Calsonic general account, made payable to the Mitsubishi Bank of California, and used to purchase wire transfers to the Yacranda clearing account. In 1984, six checks totaling $ 3 million were drawn on the Calsonic general account, made payable to the Mitsubishi Bank of California, and used to purchase wire transfers to the Yacranda clearing account. From October 1984 through October 1985, petitioner drew seven checks totaling $ 4.2 million on the Calsonic general account, made payable to the Mitsubishi Bank of California, and authorized wire transfers from the Mitsubishi Bank of California to the Yacranda clearing account. In 1985, petitioner authorized a wire transfer of $ 1.3 million from the Calsonic general account to the Yacranda clearing account. On March 25, 1986, petitioner signed five checks, each in the amount of $ 900,000, on the Calsonic general account, payable to the Mitsubishi Bank of California. Petitioner purchased a cashier's check in the amount of $ 4.5 million, made payable to Gibraltar, and deposited the cashier's check into the Gibraltar account on March 27, 1986. From 1983 through 1986, petitioner transferred no less than *358 $ 15,575,000 from the Calsonic general account to the Yacranda clearing account, the Gibraltar account, and the Masato account, in the manner set forth above. Funds transferred from the Calsonic general account to the Yacranda clearing account were subsequently transferred to other Yacranda bank accounts and brokerage accounts, to individuals as loans, and to Jacranda. Petitioner made or caused to be made numerous journal entries on the books of Calsonic, the net effect of which was to report the funds diverted as aforesaid as a cost of goods sold. Jacranda invested extensively in Japanese and U.S. stock, including over $ 5 million in Nihon Radiator stock. Funds were also used to purchase real property in Hawaii (the Kapoho property), a motel in Anaheim, California (the Anaheim motel), and petitioners' personal residence in Newport Beach, California. As a Calsonic officer, petitioner was entitled to receive a housing allowance or to live in a company-owned house. In February 1986, petitioner used $ 96,000 of funds transferred from Calsonic to Yacranda to purchase a membership for petitioners at a country club. Petitioners obtained American Express credit cards on the account *359 of Jacranda and used the credit cards for personal and business expenses. Fukuwa also used an American Express card on the account of Jacranda. Although petitioners considered their personal charges on the American Express card that were paid by the corporation to be additional salary to petitioner, they did not report any income from payment of their personal expenses by the corporation. In 1983, Arai decided that Peat Marwick should replace Fukuwa as Calsonic's accountant. Petitioner opposed the change in accountants. Peat Marwick's 1983 engagement letter proposed a thorough review of Calsonic's internal accounting controls. In 1986, Peat Marwick commenced a full-scale audit of Calsonic. Peat Marwick auditors discovered certain transfers and requested explanations. Petitioner gave inconsistent and untrue explanations. A team from Japan, including Tsutomu Murakami (Murakami), a member of the board of directors, came to California and conducted interviews. Within 2 weeks, the above transfers of funds had been identified. Calsonic employed counsel and entered into negotiations with petitioner for return of the transferred funds. On or about August 4, 1986, petitioner signed *360 a document in which he stated that "The creation of illegal funds through the manipulation of Calsonic's Books/Ledger was conducted entirely by myself. * * * I request that you discharge me for cause and pursue criminal charges against me." A similar letter, dated September 4, 1986, was written to Murakami. On September 6, 1986, petitioner caused 2,530,000 shares of Nihon Radiator stock, having a value in excess of $ 10 million but subject to a loan of approximately $ 3 million, to be transferred to a trust controlled by Murakami as an agent of Nihon Radiator. It was contrary to Japanese law for Nihon Radiator or Calsonic to trade its own stock. In 1986, petitioner caused approximately $ 8.5 million in cash to be transferred to Calsonic. By August 15, 1986, all of petitioner's interests in Jacranda and Yacranda were transferred to Fukuwa. In 1987, the Kapoho property and the Anaheim motel were transferred to a trust created by Calsonic. Petitioner employed counsel in August or September 1986. The first attorney that was hired by petitioner terminated the relationship in April 1987, because he was also representing Fukuwa. Petitioner hired another lawyer, who threatened litigation *361 against Calsonic for wrongful termination of petitioner's employment. Meanwhile, petitioner had commenced a letter-writing campaign making various accusations against Arai, Calsonic, and Nihon Radiator. Calsonic and Nihon Radiator wished to avoid publicity and public scandal. During 1987, petitioners traveled to Japan. Although petitioners were outside the United States for most of 1987, they were in the United States no less than 101 days that year. They did not establish a residence other than the Newport Beach residence. In December 1987, petitioner, Fukuwa, Jacranda, Calsonic, and Nihon Radiator executed a written settlement agreement. Concurrent with the execution of the settlement agreement, the parties executed respective releases of liability. Petitioners received their personal residence in Newport Beach, the Kapoho property, the Anaheim motel, and a promissory note for $ 117,322.69. The fair market value of the Anaheim motel at the time of the transfer was $ 860,000. The settlement contained a paragraph that included the following: Except as may be required by law, each party shall keep confidential this Settlement Agreement and the terms of this Settlement *362 Agreement. No party to this Agreement * * * shall disclose, directly or indirectly, to any third party, or make or cause to be made, any press release, announcement or other statement contemplated to [be] made in public which discloses any of the terms of this Settlement Agreement or the fact thereof. * * *
The settlement agreement did not state any particular disputes between the parties that were settled, merely reciting that it was entered into "in full and complete settlement of any and all actual and potential claims and disputes between them of every nature whatsoever." On March 31, 1988, petitioner transferred petitioners' personal residence to Mrs. Ishijima. On August 22, 1990, Mrs. Ishijima transferred the residence to her parents, who were residents of Japan. On December 26, 1990, Mrs. Ishijima's parents transferred the residence to petitioners. On August 6, 1992, petitioner executed a quitclaim deed, and petitioners executed a grant deed by which the property was again transferred to Mrs. Ishijima. All of the foregoing transfers were without consideration. In about 1990, Calsonic was audited by the IRS. The revenue agents discovered the return of funds from *363 petitioner to Calsonic. They began investigating petitioner. Petitioner told the agents that the funds had been taken pursuant to the instructions of his superiors in Calsonic. Petitioner represented or implied that he was instructed to create a "slush fund" to minimize U.S. taxable income of Calsonic and to facilitate illegal investments by Calsonic and Nihon Radiator, including investments in Nihon Radiator stock. Petitioner labeled the program "Project X" and presented to revenue agents various written documents purporting to substantiate his explanation. Some of the documents were forged. Meanwhile, petitioner continued with a campaign of letter writing to various persons and agencies, complaining about Calsonic, Arai, and others. He filed a complaint with the California State Bar Association against his former lawyer. On March 26, 1993, Mrs. Ishijima filed an action against Calsonic and various individuals, including Arai and Murakami, alleging that, on or about August 18, 1986, the defendants had promised to pay Mrs. Ishijima's medical bills and other compensation and had failed to do so. Someone employed a private investigator to conduct surveillance of petitioner. *364 The investigator came forward to testify at trial of these cases that he found certain incriminating documents in petitioners' trash. Petitioner filed individual income tax returns for 1983 and 1984, and petitioners filed joint Federal income tax returns for 1985, 1986, and 1987. They filed their 1987 return on the basis of U.S. residence. In 1993, during preparation for trial of these cases, petitioners contended for the first time that they were not validly married at the end of 1985 and that, therefore, Mrs. Ishijima was not a party to a valid joint return for that year. On September 12, 1991, respondent sent to petitioners a statutory notice for 1987. Respondent determined that petitioners had unreported income from the settlement with Calsonic consisting of $ 525,000 as the value of their personal residence, $ 860,000 as the value of the Anaheim motel, $ 523,000 as the value of the Kapoho property, and $ 117,323 as the face amount of the Jacranda note, for a total $ 2,025,323. On March 16, 1992, respondent sent petitioner a statutory notice for 1983 and 1984, determining that petitioner had unreported embezzlement income of $ 2,725,000 in 1983 and $ 3 million in 1984. *365 Also, on March 16, 1992, respondent sent petitioners a statutory notice for 1985 determining that they had unreported embezzlement income of $ 5.5 million in that year. Respondent did not determine a deficiency for 1986 because of the funds that were returned to Calsonic by petitioner during that year. OPINION If, as respondent alleges, petitioner had $ 15,575,000 in embezzlement income from 1983 through 1986, repayment of that amount in 1986 would not eliminate the taxability of the amounts received in the first 3 years. Yerkie v. Commissioner, 67 T.C. 388 (1976). At the end of the fifth year, petitioner received approximately $ 2 million worth of property. Respondent determined deficiencies and additions to tax totaling over $ 11 million, plus interest (effectively 150 percent of the normal interest on the deficiencies, taking into account section 6653(b)(2) and (b)(1)(B)). Respondent contends that petitioner's employer did not report the embezzlement to criminal authorities and actually paid petitioners over $ 2 million in order to avoid adverse publicity. Petitioner contends that the transfers of funds that he carried out were done at his *366 employer's direction. Petitioners also contend that the funds received in 1987 were received for personal injuries, to wit, the damage to Mrs. Ishijima relating to petitioners' divorce and Mrs. Ishijima's suicide attempt and consequential damage to her health. During trial, the parties were each repeatedly warned that the evidence that they were presenting was defective and would not be persuasive in satisfying their respective burdens of proof. Petitioner was told that his inconsistent explanations and admitted falsification of documents during the examination of his tax liability undermined his credibility, so that his testimony would require corroboration. Respondent's counsel were warned that their personal beliefs and characterization of events, frequently inserted in leading questions to various witnesses, were not evidence. Self-righteous rhetoric is no substitute for facts established by the record. The unusual events described in our findings make the scenarios propounded by the parties equally plausible or implausible. For the reasons described below, we conclude that respondent has not proven fraud by clear and convincing evidence. We also conclude that respondent *367 has not proven that petitioners omitted more than 25 percent of their adjusted gross receipts from their 1985 return. Therefore, assessments for 1983, 1984, and 1985 are barred by the statute of limitations. Because their evidence is also unreliable, petitioners have not satisfied their burden of proof with respect to 1987. Respondent's Burden of Proof
In order to sustain the addition to tax for fraud for each year and to overcome the statute of limitations with respect to 1983, 1984, and 1985, respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of the underpayment was due to fraud. Secs. 6653(b)(1), 7454(a); Rule 142(b). In the alternative, respondent contends, and must prove by a preponderance of the evidence, that the statute of limitations does not bar assessment for 1985 because petitioners omitted "from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return". Sec. 6501(e)(1)(A); Stratton v. Commissioner, 54 T.C. 255, 289 (1970); see Kavoosi v. Commissioner, T.C. Memo. 1986-190. *368 The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud may, however, be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969). Intent may be inferred from various kinds of circumstantial evidence, or "badges of fraud", including understatement of income, inadequate records, implausible or inconsistent explanations of behavior, concealing assets, or failure to cooperate with tax authorities. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601. In these cases, respondent's *369 strongest evidence is petitioner's falsification of documents to corroborate his version of the events of the years in issue and other conduct after investigation of his tax liability began. Other indicia of intent, however, do not establish fraud if respondent fails to prove unreported income and an underpayment of tax. Cf. Considine v. United States, 683 F.2d 1285, 1287 (9th Cir. 1982); Wright v. Commissioner, 84 T.C. 636 (1985). With respect to 1983, 1984, and 1985, respondent's fraud theory in these cases is based entirely on respondent's assertion that the amounts transferred by petitioner from Calsonic to various other entities, and ultimately returned to Calsonic's designee, were funds embezzled by petitioner and includable in petitioner's income. However, receipt, possession, or control over money, standing alone, does not establish unreported gross income. If, as petitioner contends, he received the funds as an agent or conduit for his employer, they are not taxable. Lashells' Estate v. Commissioner, 208 F.2d 430, 435 (6th Cir. 1953), affg. in part, revg. in part and remanding *370 a Memorandum Opinion of this Court; Leich v. Commissioner, T.C. Memo. 1989-632; Apothaker v. Commissioner, T.C. Memo. 1985-445; Liddy v. Commissioner, T.C. Memo. 1985-107, affd. 808 F.2d 312 (4th Cir. 1986); Bonner v. Commissioner, T.C. Memo. 1966-96. Respondent contends: Ishijima is clearly obsessed with his 1983 divorce from Hiroko and his belief that Arai and Calsonic caused the divorce. Respondent contends that it was Ishijima's bitterness about the divorce that led him to embezzle from Calsonic. * * * * * * Apparently unable to deal with the idea that Hiroko wanted to divorce him, Ishijima appears to have twisted the facts in his mind, and blamed Arai for the whole problem. In Ishijima's mind, Arai was forcing divorce on Ishijima and Hiroko. Significantly, Ishijima did not call Hiroko to testify on this or any other issue. Whether Ishijima's beliefs were based in reality or not, one thing is clear: he was very angry with Arai and Calsonic.
Even if respondent's description of petitioner's state of mind is correct, *371 it does not compel the conclusion that petitioner embezzled money from Calsonic and failed to report that income with the intent to evade taxes. Although petitioner has, from time to time, made various inconsistent statements about the reasons for the diversion of funds from Calsonic to other accounts, he has contended throughout these proceedings that his conduct was authorized or directed by Calsonic management, specifically Arai. Given the large and visible transactions, the failure to detect an alleged embezzlement over a period of 4 years, during which the company had outside accountants, suggests that respondent's version of events is not reliable. Even through the time of trial, Fukuwa, who had assisted petitioner in forming various entities and transferring funds to those entities, indicated disbelief that petitioner's activities constituted embezzlement. No one accused Fukuwa of embezzlement. Petitioner, perhaps in desperation, made false statements and presented false documents in support of his explanation of events after he was contacted by the IRS. It is not surprising that his explanation would not be corroborated by the Calsonic executives called as witnesses *372 by respondent, even if petitioner's explanations were true. The bias of witnesses giving contradictory evidence must be considered. See Anderson v. Bessemer City, 470 U.S. 564, 575 (1985); Henson v. Commissioner, 835 F.2d 850, 853 (11th Cir. 1988), affg. in part, revg. in part and remanding T.C. Memo. 1986-303. By the time the testimony of these witnesses was taken, petitioner had sued or otherwise caused various types of trouble for those witnesses. While we must condemn, not condone, petitioner's conduct, the lack of corroboration for his explanation does not render it implausible. See Liddy v. Commissioner, supra.
Prior to and throughout the trial, the Court warned respondent's counsel that excessive rhetoric, circular arguments, conclusory use of terms such as embezzlement, theft, and lying, and leading questions to respondent's witnesses would not satisfy respondent's burden of proof. For example, respondent's counsel asserted in the trial memorandum and in a leading question to a witness from Peat Marwick that petitioner shredded documents. The Court *373 commented at the time of trial that the question was leading, thereby giving respondent an opportunity to correct the problem by seeking detailed testimony from the witness. The witness, however, gave no details of the alleged shredding, such as time, place, or what she saw. At the conclusion of the trial, the Court stated that no finding that petitioner shredded documents would be made. Nonetheless, respondent's counsel proposed a finding that documents were shredded. Similar questions to substantially all of respondent's witnesses are the basis of substantially all of respondent's proposed findings citing testimony, when the proposed facts are just assertions in the questions. (Respondent's reply brief accuses petitioner of doing the same thing; but petitioner followed respondent's counsel's example throughout the trial.) Such tactics suggest or reveal weakness in respondent's case. We have not made the findings sought in such circumstances. Despite a lengthy record, we are unable to reach factual conclusions supporting the respective positions of either party. We conclude that respondent has not presented clear and convincing evidence that petitioner had income from embezzlement *374 during 1983, 1984, or 1985. Moreover, we are not persuaded that the evidence is sufficiently reliable to support a finding that petitioner had embezzlement income in 1985 that was includable on his tax return for that year. Thus, respondent has not established fraud or an omission of income sufficient to prevent application of the statute of limitations. The deficiencies determined for 1983, 1984, and 1985 are thus barred. For 1987, respondent contends that petitioner's failure to disclose income from receipt of property pursuant to the 1987 settlement with Calsonic was fraudulent because petitioner failed to get advice concerning whether the settlement was income, gave inconsistent reasons why it was not income, and "did not report the 1987 settlement proceeds * * * because he thought the IRS would never find out, secrecy having been an express term of the settlement agreement." Respondent then asserts a 4-year pattern of underreporting as evidence of fraud. As indicated above, respondent has not proven fraud for 1983, 1984, and 1985. Because petitioner repaid the funds in 1986, respondent has not determined a deficiency for that year. The taxability of the settlement proceeds *375 is a separate issue from the alleged embezzlement income. Although we sustain the deficiency for 1987 because of petitioners' failure to satisfy their burden of proof, again we conclude that respondent has not proven, by clear and convincing evidence, that petitioner had unreported income and failed to report it in order to evade taxes known to be owing. See Baumgardner v. Commissioner, 251 F.2d 311, 322 (9th Cir. 1957), affg. T.C. Memo. 1956-112. Petitioners' Burden of Proof
For 1985, petitioners contend that, because the Japanese divorce had terminated their marriage as of the end of the year, they did not file a valid joint return for 1985. Petitioners also contend that Mrs. Ishijima was an innocent spouse. Because we have concluded that the statute of limitations bars assessment for 1985, we need not reach these issues. For 1987, petitioners contend that the property received from Calsonic constituted damages for personal injuries, excludable from income under section 104(a); that petitioners were residents of Japan in 1987 and tax on the amounts received from Calsonic should be not taxed by the United States *376 or should be taxed in proportion to the time spent in the United States and in Japan; and that Mrs. Ishijima is an innocent spouse. If we determine that petitioner had income from embezzlement, petitioner contends that he is entitled to a deduction in 1987 for additional funds returned to Calsonic by Yacranda in that year. Petitioners have the burden of proof on all of these issues. Although she was present during the entire trial, Mrs. Ishijima did not testify. All of the witnesses other than petitioner denied that the amounts paid to petitioners in 1987 related to the claimed personal injuries. Petitioner's testimony cannot be accepted because of the numerous examples of false evidence created by him and the inconsistencies in his explanations. The documentary evidence contradicts petitioners' position on each of the issues. Mrs. Ishijima was not a party to the settlement agreement, and nothing in it or in any of the communications leading to it indicates that personal injuries suffered by her were being compensated. Petitioners maintained their residence in Newport Beach throughout all of the years in issue and through the time of trial of these cases. There is no showing *377 that they severed any connections with the United States, other than petitioner's employment, and they filed a joint U.S. income tax return for 1987 reporting as U.S. residents. Title to petitioners' residence was transferred to and ultimately retained by Mrs. Ishijima. Petitioners apparently believe that respondent's concession, at the beginning of the trial, that Mrs. Ishijima was not subject to the additions to tax for fraud constitutes evidence that she is an innocent spouse. The term "innocent spouse", however, requires satisfaction of the specific requirements of section 6013(e), including that the unreported income was "attributable to grossly erroneous items of one spouse" (sec. 6013(e)(1)(B)), that "she did not know, and had no reason to know, that there was such substantial understatement (sec. 6013(e)(1)(C)), and "taking into account all the facts and circumstances, it is inequitable to hold * * * [her] liable for the deficiency in tax" (sec. 6013(e)(1)(D)). Petitioners' contention that the settlement proceeds were received by reason of personal injuries to Mrs. Ishijima undermines their contention that the unreported income thus received was attributable to petitioner *378 as the "other spouse". Certainly Mrs. Ishijima knew of the items giving rise to the unreported income. See Bokum v. Commissioner, 94 T.C. 126, 148-152 (1990), affd. on other grounds 992 F.2d 1132 (11th Cir. 1993). There is no evidence that it would be inequitable to hold Mrs. Ishijima jointly liable with petitioner for the deficiency for 1987. Petitioners have not proven that they are entitled to any additional deductions against the unreported income determined by respondent. They have not presented any evidence that the real property values were less than the amounts determined, although they contend, without evidentiary support, that the Anaheim motel was worth only $ 700,000. They have not disputed inclusion of the face amount of the Calsonic note in their income for 1987. Finally, petitioners have not proven that they were not negligent in failing to report the settlement proceeds on their 1987 return, and they have not shown that they had substantial authority for the position that the proceeds were not taxable. They are liable for the additions to tax for negligence and for a substantial understatement of tax *379 for that year. Secs. 6653(a), 6661. We have considered the other arguments of the parties. They are either unnecessary to our decisions, in view of the issues discussed above, or are without merit, because lacking in evidentiary support. Decision will be entered under Rule 155 at docket No. 27713-91. Decision will be entered for petitioners at docket No. 10832-92.