T.C. Memo. 1998-178


UNITED STATES TAX COURT


MERCEDES ARCIA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ELIO ARCIA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 15692-96, 15693-96.     Filed May 13, 1998.


<u>William R. Tunkey</u>, for petitioner in docket No. 15692-96.

<u>Philip T. Weinstein</u>, for petitioner in docket No. 15693-96.

<u>Reginald R. Corlew</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined a $35,377 deficiency in

petitioners' 1991 Federal income tax, an $18,014.38 section

6651(a)(1) addition to tax, and a $7,075 section 6662(a) accuracy-related penalty.

All section references are to the Internal Revenue Code as in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

These cases were consolidated for trial, briefing, and opinion.

The issues for decision are: (1) Whether petitioners had $106,000 of unreported income in 1991; and (2) if so, then (a) whether petitioner Mercedes Arcia (Mrs. Arcia) qualifies as an innocent spouse pursuant to section 6013(e); (b) whether petitioners are liable for the section 6651(a)(1) addition to tax for 1991; and (c) whether petitioners are liable for the section 6662(a) accuracy-related penalty for 1991.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference.

Elio and Mercedes Arcia, husband and wife, resided in Miami, Florida, at the time they filed their respective petitions in these cases.

Eduardo Macias and His Friends

Eduardo Macias, born in Cuba but living in the United States at all relevant times, served time in a U.S. prison between 1983

and 1989 for smuggling marijuana. Thereafter, he served 11 months for a parole violation. During the year in issue, Mr. Macias became an informant for the Narcotics Division of the Miami Police Department.

Prior to his imprisonment, Mr. Macias left a large quantity of money buried in plastic pipes in his backyard. He dug up the money in 1989 following his release from prison. In April 1991, Mr. Macias wanted to hide this money from his ex-wife. Accordingly, he asked a friend, Wilberto M. Morera (a self-employed construction and repair worker) to hold $115,000 for safekeeping. Mr. Morera agreed to hide Mr. Macias' money for approximately 3 months; Mr. Morera kept the money in his attic. Sometime in July 1991, Mr. Macias retrieved his money, and gave Mr. Morera $3,000 (out of the $115,000) as a gift for hiding the money.

On August 19, 1991, Mr. Macias visited another friend, Pedro Chavez. Mr. Chavez, born in Chile, was a U.S. permanent resident. He originally worked in the restaurant business (as executive chef for the Hard Rock Cafe International), and subsequently worked as a consultant in Chile, developing software for the food-service industry. Mr. Macias asked Mr. Chavez to hide $110,000[1] for him; Mr. Chavez agreed to this request because he believed he owed Mr. Macias a favor. Mr. Macias delivered the money, and Mr. Chavez

---

[1] The record is silent as to what happened to the $2,000 difference between the amount remaining ($112,000) in July and the amount given to Mr. Chavez ($110,000) in August.

made an entry in his diary indicating the receipt of the money and the exact denominations ($90,000 in $20 bills, $16,000 in $100 bills, and $4,000 in $10 bills).  Mr. Chavez kept the money in a closet in his apartment.  A week later, Mr. Chavez informed Mr. Macias that he was nervous about hiding the money and asked Mr. Macias to retrieve it.  When Mr. Macias retrieved the money, Mr. Chavez suggested that Mr. Macias hide the money with a mutual friend, Elio Arcia (petitioner).

Taking Mr. Chavez's advice, Mr. Macias went to visit petitioner, a childhood friend from Cuba.  Petitioner agreed to hold Mr. Macias' $106,000[2] for safekeeping, concealing the money in a cooler in the garage of petitioners' home at 115 S.W. 20th Road, Miami, Florida 33129.  This money was commingled with petitioner's money. Petitioner did not inform anyone about his hiding Mr. Macias' money.

The October 25, 1991, Search and Seizure

On October 25, 1991, City of Miami police officers conducted a search and seizure at petitioners' residence.  This search was later determined to have been illegal (see infra). During the search, the police officers found $201,034 concealed in a cooler in petitioners' garage.  The money was bound by rubber bands in stacks of mixed denominations.  In addition to this money, the officers

---

[2]     Again, the record is silent as to why Mr. Macias' funds dwindled.

found: (1) $500 in a bedroom; (2) $1,901 on petitioner; and (3) $8,450 in a beige box in a bedroom. In total, the officers found and seized $211,886 in cash at petitioners' residence. The police officers also seized: (1) A 1990 Nissan 240SX automobile; (2) a Smith & Wesson .38-caliber 5-shot, 2" barrel gun; (3) a Kurz 380-caliber semiautomatic gun; (4) a North America Arms .22-caliber long, 5-shot, 1" barrel gun; (5) a North America Arms .22-caliber long 3/4" barrel gun; (6) an Iver Johnson .30-caliber semiautomatic rifle; (7) two scales; and (8) a Glory money counter.

During the search, petitioner told one of the officers conducting the search, Detective Julio Morejon, that a portion of the money in the cooler belonged to a "friend". Petitioner did not disclose the "friend's" name.

Mrs. Arcia first learned about the money in the cooler on October 25, 1991, during the search and seizure.

City Forfeiture Action

On January 31, 1992, the City of Miami commenced a forfeiture action against all the currency and other personal property and assets seized from petitioners' home in the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida (the Circuit Court). The City named petitioners (and their son Elio Arcia, Jr.) as claimants. On April 24, 1992, the Circuit Court filed a Rule to Show Cause. On June 15, 1992, petitioners filed an Answer to Rule to Show Cause, agreeing that they were the claimants

to the property seized on October 25, 1991 (including the $211,886 seized from petitioners' residence). In making this claim, petitioner intended to retrieve not only his own money, but that of Mr. Macias.

On July 15, 1992, the Circuit Court granted petitioners' evidentiary motion to suppress those items seized from their home on the grounds that the search was illegal.

On September 17, 1992, petitioners filed a Motion to Dismiss Claim of Forfeiture and to Remit Claimants' Property Forthwith, claiming that the City of Miami did not timely file its complaint. On the same day, petitioners filed a Motion for Preservation of Assets, requesting that the City of Miami place the $211,886 in an interest-bearing certificate of deposit held in trust for the benefit of the prevailing party.

On November 18, 1992, the City of Miami Police Department and petitioner[3] entered a Settlement Agreement and Joint Stipulation (the agreement). In the agreement, petitioner agreed to forfeit to the City of Miami $105,933 of the seized currency, as well as the weapons, scales, and money counters, and the City of Miami agreed to transfer to petitioner $105,933 of the seized currency, as well as the 1990 Nissan 240SX. The City of Miami further agreed to forgo legal proceedings for forfeiture of petitioners' home. On

---

[3] It is unclear from the record why Mrs. Arcia was not a signatory to the agreement.

April 14, 1993, the Circuit Court filed an Agreed Order of Dismissal.

Federal Forfeiture Action

On July 29, 1992, the United States filed a Verified Complaint for Forfeiture in Rem in the U.S. District Court for the Southern District of Florida (the U.S. District Court) for the forfeiture of petitioners' Miami 115 S.W. 20th Road property. The complaint alleged that the real property constituted proceeds traceable to the exchange of controlled substances (in violation of Controlled Substances Act, Pub.L. 91-513, sec. 101, 84 Stat. 1242 (1970), 21 U.S.C. secs. 801-971). On October 5, 1992, petitioners filed a Notice of Claim, claiming an interest in the seized real property, and an Answer to Complaint for Forfeiture in Rem and Demand for Jury Trial.

On December 7, 1992, petitioners and the United States signed a Stipulation of Dismissal and Settlement Agreement. Petitioners agreed therein that "they will forever release and hold harmless [the Federal Government] from any and all claims of any kind * * * arising from the government's seizure, detention, and maintenance of the defendant['s] property". On December 11, 1992, the U.S. District Court filed a Final Order of Dismissal.

Mr. Macias' Affidavit and Subsequent Death

On August 4, 1994, Mr. Macias signed a notarized affidavit stating that in August 1991 he "entrusted" petitioner with $110,000 for "safekeeping".

On September 8, 1994, Mr. Macias met with Internal Revenue Agent Stephen Swafford in order to confirm the statements made by Mr. Macias in his affidavit. During the interview, Mr. Macias stated that he had earned the money while working as a fisherman in the Bahamas during the 1970's. He further stated that he originally buried the money in his backyard but subsequently entrusted the money to Messrs. Mendez, Chavez, and petitioner for safekeeping. After the money was seized on October 25, 1991, Mr. Macias was afraid to make a legal claim for its return because he was on parole and was concerned that if he were to claim the money, the money might be deemed to have come from an illegal source.

At the time of Mr. Macias' meeting with Agent Swafford, Mr. Macias made his living knocking coconuts off trees and selling them on a Miami street corner.

On October 19, 1994, Mr. Macias committed suicide. In his suicide note, Mr. Macias stated he was "grateful" to petitioner.

Petitioners' 1991 Federal Income Tax Return

Petitioners filed their 1991 Federal income tax return on July 14, 1993. They did not file for an automatic extension. On their 1991 return, petitioners reported "other income" (line 22) of $112,000, which included $106,000 as "the Taxpayer's portion of certain funds which were seized". Petitioners claimed a constitutional privilege against self-incrimination as to the

source of this income in a statement attached to their 1991 return.

## Abatement Letters

The Internal Revenue Service (IRS) assessed taxes, interest, and late payment additions with regard to petitioners' 1991 tax year. In a February 1, 1995, "Transmission of Payment and Request for Abatement of Penalties", petitioners requested abatement of the $9,169.88 in late filing addition. On March 8, 1995, the IRS notified petitioners that it had abated the late filing addition.

## Notice of Deficiency

In the notice of deficiency respondent determined that petitioners realized $212,000 of income, rather than $106,000 as reported on their 1991 return. Accordingly, respondent increased petitioners' 1991 taxable income by $106,000. Respondent also determined that petitioners were liable for a section 6651(a)(1) addition to tax and a section 6662(a) accuracy-related penalty for 1991.

## OPINION

The primary issue is factual: whether petitioners had $106,000 of unreported income in 1991 arising from currency found in a cooler in petitioners' garage during the October 25, 1991, search and seizure. Petitioners claim that $106,000 of the $201,034 found in the cooler was not their money and therefore is not includable in their 1991 income. Respondent, on the other hand, contends that ownership of the funds is irrelevant; rather,

the issue concerns dominion and control.  Respondent  posits that because petitioners had dominion and control over all of the forfeited funds, which were originally earned through an apparent illegal activity, the proceeds represent taxable income to petitioners.

The mere receipt and possession of money does not by itself constitute gross income.  See, e.g., Liddy v. Commissioner, T.C. Memo. 1985-107, affd. 808 F.2d 312 (4th Cir. 1986).  Gross income, as used in section 61(a), means the accrual of some gain, profit, or benefit to the taxpayer.  In this regard, the Supreme Court explained that a "gain `constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it.'"  James v. United States, 366 U.S. 213, 219 (1961)(quoting Rutkin v. United States, 343 U.S. 130, 137 (1952)). In determining what constitutes gross income, mere dominion and control over money and property, as may be exercised by a debtor or trustee, is not necessarily decisive.  Rather, all relevant facts and circumstances must be considered.  Liddy v. Commissioner, supra.  A taxpayer has dominion and control over cash when he or she has the freedom to use it at will, even though that freedom may be assailable by persons with better title.  Rutkin v. United States, supra.  For instance, the use of money for personal purposes is an indication of dominion and control.  Woods v. Commissioner, T.C. Memo. 1989-611, affd. per

curiam without published opinion 929 F.2d 702 (6th Cir. 1991). Furthermore, amounts received as to which a taxpayer is acting as an agent or conduit are not required to be reported as income. Goodwin v. Commissioner, 73 T.C. 215, 230 (1979); see also Liddy v. Commissioner, supra. As we stated in Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F.2d 286 (7th Cir. 1974): "We accept as sound law the rule that a taxpayer need not treat as income moneys which he did not receive under a claim of right, which were not his to keep, and which he was required to transmit to someone else as a mere conduit."

Petitioners have the burden of proof on this issue, Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933), and resolution of the issue depends upon our believing petitioner's explanation that he was acting as an agent for Mr. Macias--in essence, holding Mr. Macias' money for safekeeping--and that no portion thereof was used for petitioners' personal benefit. Accordingly, we must distill truth from falsehood. See Diaz v. Commissioner, 58 T.C. 560, 564 (1972).

Although the facts herein may seem improbable, we believe them to be true. As acknowledged by respondent, this case hinges on the credibility of the witnesses. We found Messrs. Morera, Chavez, and petitioner to be credible witnesses. We especially found Mr. Chavez to be trustworthy, along with the notations in his diary. Mr. Macias' affidavit and Agent Swaffort's testimony confirm the

amazing "story" that unfolded at trial. We believe that $106,000 of the total $201,034 found in petitioner's cooler indeed belonged to Mr. Macias. By storing the money with petitioner, Mr. Macias followed a pattern: First he stored the money with Mr. Morera, then with Mr. Chavez, and finally with petitioner. Consequently, petitioner acted as a conduit or agent for Mr. Macias.

We agree with respondent that a taxpayer's forfeiture of seized currency does not prevent it from being included in his gross income. See, e.g., Gambina v. Commissioner, 91 T.C. 826 (1988). However, we disagree with respondent's contention that in this case substantive evidence exists proving that the $106,000 seized and forfeited was linked to petitioner's drug-related activities. During cross-examination, petitioner asserted his Fifth Amendment rights and refused to answer questions posed to him by respondent's counsel concerning petitioner's possible involvement in selling drugs. Although we are mindful that an individual's failure to answer questions may give rise to an inference that if he had answered, the answers would have harmed him, Baxter v. Palmigiano, 425 U.S. 308, 316-319 (1976), we do not believe this inference directly links the $106,000 at issue to an illegal activity involving petitioner.

Additionally, we disagree with respondent's argument that because petitioner was a claimant in the State and Federal actions, the $106,000 at issue must have belonged to him. "A claimant need

not own the property in order to have standing to contest its forfeiture; a lesser property interest, such as a possessory interest, is sufficient for standing." <u>United States v. $38,000.00 in U.S. Currency</u>, 816 F.2d 1538, 1544 (11th Cir. 1987).

Considering all the facts and circumstances herein, we conclude that petitioners are not required to include in gross income the $106,000 of forfeited funds. Thus, we hold that petitioners are not liable for the 1991 deficiency.

Based upon our holding above that petitioners are not liable for the 1991 deficiency, we need not decide whether Mrs. Arcia was an innocent spouse in that year. Moreover, as a result of our holding that petitioners are not liable for the 1991 deficiency, no part of the section 6651(a)(1) addition to tax is attributable to the deficiency, and consequently we have no jurisdiction over this addition. See sec. 6665(b); <u>Meyer v. Commissioner</u>, 97 T.C. 555, 562 (1991). Finally, based upon our holding that no understatement exists, we need not address whether petitioners are liable for the section 6662(a) penalty.

To reflect the foregoing,

<u>Decisions will be entered for petitioners</u>.