T.C. Memo. 1997-74


UNITED STATES TAX COURT


LEO AND ALLA GOLDBERG, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18842-94.                     Filed February 11, 1997.


<u>Joseph E. Mudd</u> and <u>Jeri L. Gartside</u>, for petitioners.

<u>Miles D. Friedman</u> and <u>Zachary W. King</u>, for respondent.

Table of Contents


Findings of Fact . . . . . . . . . . . . 3

Petitioners' Residence . . . . . . . . . . . . . . . . . . . . . 5
Malloy Property . . . . . . . . . . . . . . . . . . . . . . . . 7
Exchange Properties . . . . . . . . . . . . . . . . . . . . . . 8
Unemployment Compensation . . . . . . . . . . . . . . . . . . . 12
Petitioners' Bank Accounts . . . . . . . . . . . . . . . . . . 12
Roman Kortava and Coastline Limited, Inc. . . . . . . . . . . . 13
Saddle Rock and Martis Landing . . . . . . . . . . . . . . . . 16
Business School . . . . . . . . . . . . . . . . . . . . . . . . 19
Vehicle Resale Business . . . . . . . . . . . . . . . . . . . . 20
Vladimir Chorny . . . . . . . . . . . . . . . . . . . . . . . . 21
15 Hastings . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Clerical Fee . . . . . . . . . . . . . . . . . . . . . . . . . 24

Opinion . . . . . . . . . . . . . . . . 24

Fraud . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Unreported Income--Bank Deposits . . . . . . . . . . . . . . 31
Unreported Income--Like-Kind Exchange . . . . . . . . . . . 32
Unreported Income--Unemployment Compensation . . . . . . . . 34
Unreported Income--Kortava . . . . . . . . . . . . . . . . . 34
        Mercedes . . . . . . . . . . . . . . . . . . . . . . 37
        Saddle Rock and Martis Landing . . . . . . . . . . . 38
Unreported Income--Deeds in Lieu of Foreclosure . . . . . . 42
Unreported Income--Interest . . . . . . . . . . . . . . . . 45
Schedule C Income--1990 . . . . . . . . . . . . . . . . . . 45
        Business School . . . . . . . . . . . . . . . . . . 46
        Vehicle Resale Business . . . . . . . . . . . . . . 46
Schedule C Expenses--1991 . . . . . . . . . . . . . . . . . 48
        Vehicle Resale Business . . . . . . . . . . . . . . 48
        Business School . . . . . . . . . . . . . . . . . . 50
Unreported Income--Chorny . . . . . . . . . . . . . . . . . 51
15 Hastings--Option Payment . . . . . . . . . . . . . . . . 52
15 Hastings--Lease Versus Sale . . . . . . . . . . . . . . . 55
Unreported Income--Clerical Fee . . . . . . . . . . . . . . 59
Section 6651(a)(1) Addition to Tax . . . . . . . . . . . . . 59
Section 6662(a) Penalty . . . . . . . . . . . . . . . . . . 60

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Chief Judge</u>:  Respondent determined deficiencies in, additions to, and penalties on petitioners' income taxes as follows:

|  |  | Additions to Tax and Penalty | | |
|  |  | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(b)(1)</u> | <u>6663</u> |
| 1988 | $108,150 | --- | $81,044 | --- |
| 1990 | 108,277 | $27,069 | --- | $81,208 |
| 1991 | 1,926 | 29,349 | --- | 86,945 |

In the alternative to fraud, respondent determined that petitioners were liable for the section 6653(a) addition to tax for negligence for 1988 and the section 6662(a) accuracy-related penalty for 1990 and 1991.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for

the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the issues remaining for decision are:

For 1988, whether the statute of limitations bars assessment and, if not, whether petitioners had unreported income from various real estate transactions, unemployment compensation, and unexplained bank deposits and whether they are entitled to deductions relating to their taxi business.

For 1990 and 1991, whether petitioners had various items of unreported income and whether they are entitled to deductions relating to a vehicle resale business and a business school.

For all years, whether petitioners are liable for the additions to tax and penalties determined by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. Petitioners, Leo Goldberg (petitioner) and Alla Goldberg (Mrs. Goldberg), were married and resided in Orange County, California, at the time they filed their petition.

Petitioner immigrated to the United States from the Soviet Union in 1977. Petitioner received a degree in engineering from Moscow University, and he earned an M.B.A. from Pepperdine University in December 1987. Petitioner has been involved, at least to some extent, with real estate since 1986. He became

familiar with Internal Revenue Code provisions dealing with real estate transactions. He prepared petitioners' tax returns for each of the years in issue. Mrs. Goldberg signed the returns, but petitioner did not go over the contents of the returns with her nor did she review the returns line by line.

Petitioners reported the receipt of the following amounts on their 1988 return:

| | |
|---|---:|
| Rents | $58,955 |
| Interest | 3,359 |
| Dividends | 877 |
| Taxi | 19,500 |

Petitioners' 1990 and 1991 returns were received by the Laguna Niguel District Office on October 18, 1991, and October 15, 1992, respectively. Although each return indicated that an extension of time to file had been obtained, each reported that no payment had been made with the extension request.

Petitioners' Residence

Beginning June 1, 1981, petitioners resided at 2311 Apricot, Irvine, California (Apricot), a condominium with two bedrooms and a loft.

On January 23, 1988, petitioners executed a "Reservation Instrument" and made a deposit to purchase a residence located at 14 Siros, Laguna Niguel, California (14 Siros). They entered into a purchase and sale agreement for 14 Siros on March 15, 1988, agreeing to acquire that residence for $274,900. In March 1988, they executed various documents selecting custom options for paint, tile, and other features of the residence to be completed at 14 Siros.

During 1988, homes in an exclusive gated community in Laguna Niguel were made available to prospective purchasers through a lottery conducted by Standard Pacific, L.P. (Standard Pacific). Petitioners participated in the lottery and were selected to acquire a residence at 25 Hastings, Laguna Niguel, on April 30, 1988. On May 1, 1988, petitioners executed a reservation document and made a deposit for purchase of 25 Hastings.

On or after May 11, 1988, petitioners executed escrow instructions that referred to the purchase of 14 Siros as relating to "a 1031 tax deferred exchange". The exchange provision of the escrow instructions was canceled in June 1988.

Construction at 14 Siros and petitioners' purchase of that property were completed on August 2, 1988.

On August 14, 1988, petitioners executed a purchase contract and escrow instructions for the purchase of 25 Hastings. On escrow instructions and loan applications relating to their purchase of 25 Hastings, petitioners represented that their residence was Apricot. On at least two occasions, petitioner misrepresented his monthly income on residential loan applications.

On August 23, 1988, petitioners hired Donna Nichols (Nichols), a real estate agent, to sell 14 Siros. Nichols lived at 16 Siros. On September 4, 1988, 14 Siros was sold for $385,000.

In September 1988, petitioners entered into an agreement to sell Apricot to Hector David Cordova for $137,000. The sale was completed on November 9, 1988. At the time of the sale, petitioners' adjusted basis in Apricot was $126,543.

Escrow closed on the purchase of 25 Hastings on November 1, 1988. Petitioners occupied 25 Hastings as their principal residence from November 1988 at least through the time of trial of this case in 1996.

At the time that they contracted to purchase 14 Siros, petitioners intended to occupy it as their principal residence. At the time that they contracted to purchase 25 Hastings, however, petitioners abandoned their intention to occupy 14 Siros. Petitioners never occupied 14 Siros as their principal place of residence.

On their 1988 tax return, petitioners reported the sale of Apricot as a sale of business property. They executed a Form 2119, Sale of Your Home, with respect to 14 Siros. They attached this form to their 1988 Federal tax return, thereby claiming the right to defer under section 1034 a gain of $81,555 realized on sale of 14 Siros.

At the time that he prepared and filed petitioners' tax return for 1988, petitioner was familiar with the requirements for deferral of gain under section 1034. Petitioner knew that petitioners did not qualify for deferral with respect to the gain on the property at 14 Siros, but he nonetheless claimed the deferral in order to defeat or avoid the taxes known to be owing on the gain that they realized from sale of that property.

Malloy Property

On June 21, 1979, petitioner acquired an undivided one-half interest in property at 8132 Malloy Drive, Huntington Beach, California (Malloy). In July 1988, petitioners entered into an agreement with Irvine Exchange Corporation (IEC) under which petitioners were required to convey Malloy to IEC and IEC was to act as an accommodator to petitioners for the exchange of then unspecified property with then unknown third parties. That exchange, however, was never completed with respect to Malloy. Rather, on August 26, 1988, Malloy was sold to Anthony J. Vaccaro for $209,000, of which $104,500 was for petitioners' interest in Malloy.

Petitioners reported gain from the sale of Malloy on their Form 4797, Sales of Business Property, attached to their 1988 return.  They misreported the net proceeds they received from sale of the property, $37,531, as the "Gross sales price" and calculated their gain as follows:

| | |
|---|---|
| Gross sales price | $37,531 |
| Depreciation | 12,333 |
| Adjusted basis and expenses | (44,554) |
| Gain reported | $ 5,310 |

The gain should have been calculated as follows:

| | |
|---|---|
| Gross sales price | $104,500 |
| Depreciation | 18,333 |
| Adjusted basis and expenses | (52,254) |
| Gain realized | $ 70,579 |

Thus, petitioners underreported their income of the Malloy property by $65,269.  At the time that he prepared petitioners' 1988 Federal tax return, petitioner knew that he was required to report the gross sales price, not the net proceeds, in computing the gain.  He failed to report the gross sales price in order to defeat or avoid the payment of taxes known to be owing on petitioners' gain from the sale of Malloy.

Exchange Properties

On or about January 31, 1986, petitioners acquired for $205,000 an interest in certain property in Orange County, California, known as the Detroit properties.  In February 1986, petitioners conveyed an undivided one-half interest in the Detroit properties to Boris and Natliya Landau (the Landaus) for no cash consideration.

In August 1988, petitioners entered into an exchange agreement under which they would exchange their interest in the Detroit properties for yet unspecified property that was subject to a mortgage of at least $106,523.  By grant deed dated August 31, 1988, petitioners transferred their interest in the Detroit properties to IEC.  IEC and the Landaus then conveyed the Detroit properties to a purchaser for $365,000, or $182,500 for petitioners' one-half interest.  On their 1988 return, petitioners reported that their adjusted basis in the Detroit properties was $132,840 and that the Detroit properties were sold in a transaction in which no gain or loss was recognized under section 1031.  By the end of 1988, petitioners had taken depreciation on the Detroit properties equal to $14,073.

On or about July 10, 1986, petitioners acquired an interest in certain real property in Huntington Beach, California, known as the 8th Street property.  On or about August 19, 1986, petitioners acquired an additional interest in the 8th Street property.

In September 1988, petitioners entered into an exchange agreement with IEC to exchange their interest in the 8th Street property for, as of then, unidentified property.  By grant deed dated September 12, 1988, petitioners transferred their interest in the 8th Street property to IEC.  IEC then conveyed the 8th Street property to a purchaser for $344,000.  Petitioners reported that their adjusted basis in the 8th Street property was

$219,234 and that allowable depreciation totaled $13,753.  On their 1988 return, petitioners reported that the 8th Street property was sold in a transaction in which no gain or loss was recognized under section 1031.

Standard Pacific allowed each purchaser to purchase only one home on Hastings through its lottery system.  Lisa Shumin (Shumin), Mrs. Goldberg's mother, entered the lottery with Standard Pacific and was selected to acquire 29 Hastings.  The total purchase price of 29 Hastings was $475,000.  Standard Pacific received an initial deposit of $8,000 in Shumin's name on or about May 2, 1988.

During 1988 through 1990, Shumin worked as an accountant and earned approximately $24,000 per year.  Shumin qualified to purchase 29 Hastings only because she misrepresented her income and job title on the Buyer's Financial Worksheet provided to Standard Pacific's representative and on the loan application with Home Savings of America under which the bank loaned $356,200 to her.  Of the $122,500 that was needed as a downpayment to acquire 29 Hastings, petitioners provided at least $93,500, including the initial deposit and $80,000 that was transferred from petitioners' escrow on the sale of 14 Siros.

On August 14, 1988, escrow opened for Shumin's purchase of 29 Hastings.  Shumin paid $10,119 for flooring installed in 29 Hastings.  From December 2, 1988, until February 1989, Shumin paid $46,500 for landscape improvements to 25 and 29 Hastings.

On October 5, 1988, petitioners, Shumin, and IEC executed a document entitled "Acquisition of Exchange Property Instructions" that designated 29 Hastings as the exchange property for the Detroit properties and the 8th Street property.  IEC agreed to purchase 29 Hastings for $540,000.

Escrow closed for Shumin's purchase of 29 Hastings on October 21, 1988.  The proceeds from Shumin's $356,200 Home Savings of America loan were remitted to Standard Pacific.

On December 15, 1988, escrow closed on Shumin's sale of 29 Hastings to petitioners (through IEC), and she received $180,094 from Merrill Lynch Escrow.  Petitioners assumed the Home Savings of America loan on 29 Hastings.  The proceeds from the sales of the Detroit properties and the 8th Street property resulted in a balance of approximately $219,516.78 in petitioners' escrow account.  Approximately $184,000 of these funds was needed for the purchase of 29 Hastings.  Instead of receiving the excess proceeds from the escrow, petitioners, under the terms of the exchange agreement, deposited the excess proceeds to be used to pay down the mortgage they assumed on 29 Hastings.  On December 21, 1988, Home Savings of America received $36,335.11 from Merrill Lynch Escrow on behalf of petitioners to be applied to reduce the mortgage on 29 Hastings.  Home Savings of America confirmed, in a letter to petitioners dated February 1, 1989, that petitioners' December 20, 1988, payment was received on December 21, 1988, and was applied to the

principal ($33,366.58) and to the interest ($2,818.53) on the
29 Hastings loan.

Petitioners realized gain from the above exchange
transactions in an amount equal to the following:

```
Fair market value of property received          $540,000.00
Cash received                                     36,335.11
Indebtedness on property surrendered             279,987.00
Total consideration received                     856,322.11
Basis of properties surrendered
     Detroit                          $132,840
     8th Street                        219,234
                                       352,074
     Less depreciation
         Detroit             $ 14,073
         8th Street            13,753  (27,826) (324,248.00)

Indebtedness on property received                (356,024.77)


     Gain realized                               $176,049.34
```

## Unemployment Compensation

Until February 27, 1988, petitioner was employed full time
as an engineer for Analog.  For the remainder of the year,
petitioner received checks for unemployment compensation.
Petitioner received a total of $5,934 in unemployment
compensation from the State of California during 1988.
Petitioners reported $1,328 of unemployment compensation on their
1988 tax return.

## Petitioners' Bank Accounts

During all or part of the years in issue, petitioners
maintained the following banking and brokerage accounts:

| Location | Account # | Name on Account |
|----------|-----------|-----------------|
| California Federal | 6130 | Petitioner |
| California Federal | 5272 | Joint[1] |
| California Federal | 502396 | Joint |
| California Federal | 6250 | Coastline Limited |
| California Federal | 4959 | Joint |
| Bank of America | 127021914 | Petitioner |
| Bank of America | 10223-338 | Coastline Limited |
| Great Western | 503146 | Petitioner |
| American Savings Bank | 530934 | Joint |
| Dean Witter | 37089[2] | Joint |
| Charles Schwab | 5900 | Joint |
| Charles Schwab | 5846 | Petitioner |
| California Federal | 6654 | Petitioner[3] |
| California Federal | 503864 | Petitioner |
| California Federal | 6737 | Petitioner[4] |
| California Federal | 503960 | Joint[5] |
| California Federal | 503987 | Petitioner[6] |
| California Federal | 504025 | Petitioner[7] |
| Dean Witter | 37733 | Coastline Limited |
| Dean Witter | 37088 | Petitioner |
| Charles Schwab | 3843 | Coastline Ltd. |

[1]This account was petitioners' personal savings account.
[2]Originally, this was account number 29623.
[3]This account was a fiduciary account set up for David Michael Goldberg, petitioners' son.
[4]This account was a fiduciary account set up for Josephine D. Goldberg, petitioners' daughter.
[5]Petitioner's mother, Faina Gruzman, was also listed on this account.
[6]Faina Gruzman was also listed on this account.
[7]Gregory P. Moeller and Nathan Totosian were also listed on this account.

Petitioners sold Analog Devices (Analog) stock and deposited, on June 9, 1988, $44,816 of proceeds from the sale into their Charles Schwab brokerage accounts. There was no taxable gain on the sale of the Analog stock.

Roman Kortava and Coastline Limited, Inc.

Petitioner met Roman Kortava (Kortava) in 1989 at a party in the United States for their wives' relatives. From 1990 through

1992, Kortava, a native of Leningrad, lived and worked as a banker in the former Soviet Union. Kortava founded his own bank and monetary fund. Kortava made approximately $500,000 through foreign currency exchange transactions during 1989 and 1990.

On September 10, 1990, Kortava and petitioner agreed that Kortava would transfer $500,000 to petitioner for real estate investments in the United States. Petitioner was to manage these funds. Within days, they modified their agreement. Kortava decided it would be better to organize a corporation and transfer his funds to it and not to petitioner personally.

Coastline Limited (Coastline), a California corporation, was incorporated for the purposes of real estate, consulting, and marketing trade. Kortava nominally was the chief financial officer of Coastline. Coastline never filed a Federal income tax return.

Kortava transferred by wire to petitioner the following amounts:

| Date | Amount | Transferred to[1] |
|------|--------|-------------------|
| 10/22/90 | $ 20,000 | 6130 |
| 11/19/90 | 38,000 | 6130[2] |
| 11/19/90 | 20,000 | 6130[2] |
| 12/12/90 | 200,000 | 6250 |
| 12/21/90 | 14,544 | 6130[2] |
| | $292,544 | |
| 01/29/91 | 7,046 | 6130 |
| 04/17/91 | 85,000 | 6130 |
| 05/31/91 | 80,000 | 6130 |
| 07/11/91 | 29,985 | 6130 |
| 07/12/91 | 35,000 | 6130[3] |
| 10/03/91 | 1,581 | 6130 |

| | | |
|---|---|---|
| 10/11/91 | 17,000 | 6130 |
| 10/11/91 | 20,000 | 6130 |
| | $275,612 | |

[1]All account numbers are for California Federal accounts.
[2]These amounts are considered under Schedule C Income.
[3]Petitioners reported this amount on their 1991 Schedule C for the resale vehicle business.

In 1991, at Kortava's request, petitioner returned $165,000 to Kortava.

On October 24, 1990, petitioner transferred to California Federal account number 5272 the $20,000 that Kortava wired on October 22, 1990.  On December 15, 1990, petitioner transferred $50,000 from California Federal account number 6250 to open Bank of America account number 10223-338.  On February 6, 1991, petitioner transferred $50,000 from California Federal account number 6250 to open Dean Witter account number 37733.  On May 30, 1991, petitioner transferred $85,000 from California Federal account number 6250 to Schwab account number 3843.  On August 8, 1991, petitioner transferred $19,000 from California Federal account number 6250 to Dean Witter account number 37733.  On April 30, 1991, Mrs. Goldberg transferred $51,151.95 from Bank of America account number 10223-338 to Schwab account number 3843.  On June 21, 1991, petitioner transferred $188,000 from California Federal account number 6130 to petitioners' personal savings account, California Federal account number 5272.

Some of petitioners' personal expenses were paid with funds from Coastline.

Saddle Rock and Martis Landing

On March 6, 1990, petitioners withdrew $80,000 from California Federal account number 5272. Petitioners loaned $88,800 ($8,800 represented interest) to Lee and Catherine Wood (the Woods) by note dated March 7, 1990 (the March 7 note). The March 7 note was secured by a deed of trust on the Woods' property at 25881 Saddle Rock Place, Laguna Hills, California (Saddle Rock).

On April 20, 1990, petitioner withdrew $50,000 from California Federal account number 5272, and petitioners loaned $55,500 ($5,500 represented interest) to the Woods. The Woods gave to petitioner a $55,000 note (the April 20 note). The April 20 note was secured by two deeds of trust, one on Saddle Rock and the other on 1114 Martis Landing, Truckee, California (Martis Landing).

Because of financial problems, the Woods could no longer continue to pay their liabilities to petitioners. On June 19, 1991, the Woods and petitioners entered into an agreement whereby the Woods conveyed Martis Landing and Saddle Rock to petitioners by deeds in lieu of foreclosure. In return, petitioners released the Woods from the March 7 note and the April 20 note.

When the Woods conveyed Martis Landing to petitioners, Bank of America held a first deed of trust with a balance of about $135,990 on the property.

Petitioners took title to Saddle Rock subject to a deed of trust in favor of Hawthorne Savings and Loan Association (Hawthorne), securing a mortgage with a balance, as of June 7, 1991, of $464,300.37. Petitioners also took title to Saddle Rock subject to a deed of trust that secured a real estate loan with Topa Savings Bank (Topa) with a balance of $203,610.12 on June 4, 1991. On June 21, 1991, petitioner paid $20,000 from California Federal account number 5272 to Mission Viejo National Bank in satisfaction of a third trust deed on Saddle Rock.

The funds for the following payments were withdrawn from one of petitioners' joint accounts, California Federal account number 5272: (1) $80,000 for a loan to the Woods; (2) $50,000 for a loan to the Woods; (3) $28,529 for a payment to Topa; and (4) $20,000 for a payment to Mission Viejo National Bank. Petitioners also paid the following amounts out of Dean Witter account number 37733, a Coastline account: (1) $4,191.02 to Placer County Tax Collector for delinquent property taxes on Martis Landing; (2) $2,547.38 to Bank of America for delinquent payments on the Martis Landing loan; and (3) $8,203.72 to Orange County Tax Collector for delinquent property taxes on Saddle Rock. The funds in Dean Witter account number 37733 were transferred from California Federal account number 6250, a

Coastline account, where Kortava's initial wire transfer of $200,000 was deposited. Petitioners did not have an investment in Saddle Rock and Martis Landing to the extent of the delinquent tax payments, because those payments were made with funds belonging to Coastline, but the other items were paid with petitioners' personal funds.

On October 29, 1991, petitioners sold Martis Landing for $225,000 and received their net proceeds, $65,837.62, by check. Petitioners reported the sale of Martis Landing on Form 4797 on their 1991 return, reporting $13,958 of selling expenses and $10,312 of gain. Coastline was not a party to the sale of Martis Landing.

On January 1, 1992, Saddle Rock was sold to Gregory P. Moeller (Moeller) for $850,000. A Long Form Land Contract between Coastline, as vendor, and Moeller, as vendee, for the sale of Saddle Rock was not recorded until November 18, 1994. Petitioners' and Moeller's signatures on the contract were not acknowledged before a notary public until November 1994.

Kortava emigrated from Russia in March 1992 and lived in California for the remainder of 1992.

In 1994, Kortava hired an attorney to assist him in determining the ownership of Martis Landing and Saddle Rock. Because of title reports provided by the attorney and a real estate agency, Kortava believed that petitioners, not Coastline, owned the properties.

Business School

Petitioner operated the business school as a sole proprietorship under the name Coastline Ltd. The business school was formed to send American instructors to Russia to train Russian business students in the areas of economics, international marketing, general management, and comparative international management.

Petitioners reported all of the income and expenses of the business school on their Schedule C. Petitioner received a total of $34,544 from Kortava in 1990 for use in the business school.

Petitioner, d/b/a Coastline, Inc., entered into a contract with Advanced Education Systems, Inc. (AESI contract). Petitioners paid at least $20,033 of expenses incurred under the AESI contract with funds from Dean Witter account number 37733, including the following:

| Date | Payee | Amount |
|---|---|---|
| 03/15/91 | Carrousel Tour Travel | $ 830 |
| 04/11/91 | AESI | 4,000 |
| 04/23/91 | Carrousel Tour Travel | 7,391 |
| 06/02/91 | AESI | 4,000 |
| 08/28/91 | AESI | 1,000 |
| 08/29/91 | Carrousel Tour Travel | 1,104 |
| 09/13/91 | AESI | 240 |
| 09/91 | VISA[1] | 1,468 |

[1]Includes gasoline, meals, lodging, and entertainment.

Petitioner and seven others traveled to Russia as part of the operation of the business school. At the end of the course in Russia, the top students were invited to visit the United States for additional studies.

Vehicle Resale Business

Petitioner conducted a vehicle resale business as a sole proprietorship. The vehicle resale business was reported on petitioners' Schedule C under the name Coastline Ltd., Leo Goldberg sole proprietor. Petitioners paid $125 and $3,650 from Schwab account number 3843 for expenses of the vehicle resale business.

During 1990 and 1991, Kortava transferred $72,544 of his personal funds to petitioner to purchase cars for resale in Russia. In 1990, petitioner received $38,000 from Kortava and deposited this amount in California Federal account number 6130, one of his personal accounts. Petitioners reported $72,544 in gross receipts on Schedule C of their 1991 return. The contract for the sale of vehicles required specific vehicles to be delivered to Russia. If petitioner could not provide those specific vehicles, the money was to be returned to Kortava in Russia. When it was obvious that petitioner would not be able to meet the requirements of the contract, the agreement was modified, and petitioner sent to Russia his personal vehicle, a 1984 Mercedes Benz (Mercedes), and another replacement vehicle in 1991. The Mercedes had scratches and some additional damage when petitioner shipped it to Kortava. Kortava wired to petitioner $20,000 as consideration for petitioner's shipping the Mercedes to Russia.

During 1990 and 1991, petitioner purchased the following cashier's checks with funds from California Federal account number 6130:

| Date | Payee | Amount |
|------|-------|--------|
| 12/31/90 | Coastline Imports | $ 8,500 |
| 01/03/91 | Coastline Imports | 5,340 |
| 02/20/91 | Ranko Balog Co. | 3,600 |
| 07/17/91 | Sharp Auto Sales | 17,000 |

These checks were used to pay expenses of the resale vehicle business.

Petitioners did not pay any of the claimed $62,808 of expenses for the vehicle resale business with their own funds.

Vladimir Chorny

During 1990, petitioners received the following amounts from Vladimir Chorny (Chorny):

| Date | Amount | Purpose |
|------|--------|---------|
| 01/27/90 | $ 5,000 | Real estate services |
| 02/19/90 | 1,800 | Real estate services |
| 02/26/90 | 60 | [Unclear from the record.] |
| 02/26/90 | 2,435 | Real estate services |
| 04/07/90 | 1,050 | Possibly real estate services |
| 04/12/90 | 15,412 | Engineering consulting |

Petitioners reported $5,285 of the above amounts on their 1990 Schedule C as income from real estate consulting.

During 1991, petitioners received the following amounts from Chorny:

| Date | Amount |
|------|--------|
| 07/29/91 | $ 250 |
| 09/02/91 | 9,000 |

The purpose of these checks is unclear from the record. Petitioners did not report any of the above amounts on their 1991 Schedule C.

During 1990 and 1991, petitioners paid the following amounts to the Chornys:

| Date | Payee | Amount | Memo |
|------|-------|--------|------|
| 01/19/90 | Vladimir Chorny | $ 2,025 | 5,000 for stock @ 18¢ per share |
| 01/19/90 | Vladimir Chorny | 5,000 | None |
| 06/24/91 | Margarita Chorny | 30,000 | Lisa Shumin loan 1 year |
| 09/20/91 | Vladimir Chorny | 9,000 | None |

15 Hastings

On November 10, 1986, petitioners acquired Lots 20 and 22 in Block 212 of Huntington Beach, California (13th Street), for $225,000. On October 30, 1989, petitioners opened escrow on their purchase of 15 Hastings, Laguna Niguel, California (15 Hastings), for $610,000. Petitioners considered 15 Hastings to be the property that replaced the 13th Street property.

On or about November 15, 1989, petitioners obtained a $390,000 loan from World Savings and Loan Association (World Savings) and used the proceeds from this loan to acquire 15 Hastings. The World Savings loan was secured by a first trust deed on 15 Hastings. On November 20, 1989, escrow closed for petitioners' acquisition of 15 Hastings.

On November 1, 1989, petitioners and the Woods executed a four-page document entitled "Lease Option" for 15 Hastings. The Woods were in the midst of a divorce, and Catherine Wood (Mrs. Wood) needed a place to live. At this same time, the Woods were trying to sell their marital residence. The Lease Option

was to expire June 3, 1991. The Lease Option provided that the monthly lease payments would equal "the principal, interest, taxes, insurance and Association dues. (NONE of which is to be applied towards the purchase price.)" Under the terms of the Lease Option, the seller/optionor (petitioners) was to "keep current the existing trust deed loans, taxes and insurance and homeowners association dues during the entire option period to the close of escrow." Lee Wood (Mr. Wood) was to be provided with the necessary documentation for purposes of tax deductions related to 15 Hastings to be taken by Mr. Wood.

On November 3, 1989, petitioners and the Woods signed a two-page document entitled "Real Estate Purchase Option" agreement for the property located at 15 Hastings. The Real Estate Purchase Option was to expire June 1, 1991. The terms of the Real Estate Purchase Option were different than those contained in the Lease Option. The Real Estate Purchase Option did not provide for lease payments but instead stated that "optionees agree to pay all carrying costs in respect to the said property for the duration of the term of this option period to include: principal, interest, taxes, monthly association dues, any applicable insurance premiums; optionees further agree to maintain the property in good repair".

Also on November 3, 1989, the Woods deposited $10,000 with Escrow Masters as an option fee. The option fee was available to petitioners at any time following consummation of this option agreement. On December 1, 1989, petitioners withdrew the $10,000

option fee from their escrow account at Escrow Masters and deposited it into California Federal account number 502396. Petitioners did not report receipt of the $10,000 option fee on their 1989, 1990, or 1991 return.

On December 1, 1989, the Woods executed a note in favor of petitioners in the amount of $232,000. The terms of the note were "On or before June 3, 1991", with interest from November 20, 1989, payable in interest only until June 3, 1991, with the entire principal and accrued interest being due in full at that time.

Although the option was to expire in June 1991, on March 7, 1991, the Woods decided not to exercise their option on 15 Hastings. At this time, Mrs. Wood entered into a rental agreement with petitioners whereby she rented 15 Hastings for $3,149.69 per month, plus the association fee and gardening expenses. Petitioners reported the rent received from the Woods on Schedule E of the 1990 and 1991 returns as rental income.

Clerical Fee

On August 12, 1991, petitioner received a $535 check drawn on the account of Wood and Morimoto, P.C.

OPINION

Because the statutory notice of deficiency for 1988 was sent on July 20, 1994, more than 3 years after the filing of the 1988 return, assessment of a deficiency for that year is barred unless either section 6501(c)(1), dealing with false or fraudulent

returns, or section 6501(e)(1)(A), dealing with substantial omission of income, extends the period for assessment.  If we were to decide that neither section applies in this case, discussion of the other issues for 1988 would be unnecessary.

With respect to fraud, conduct over a period of years may be considered in determining fraudulent intent for a particular year.  Spies v. United States, 317 U.S. 492, 499 (1943).  Respondent must prove fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  She must prove an underpayment without reliance on petitioners' failure to overcome the normal presumption of correctness of the notice of deficiency.  Otsuki v. Commissioner, 53 T.C. 96, 106 (1969).  On the other hand, a determination that respondent has not proven fraud by clear and convincing evidence is not inconsistent with a determination that petitioners have failed in their burden of proof or that the preponderance of the evidence establishes that they have unreported income or have claimed deductions to which they are not entitled.

For the foregoing reasons, we begin our discussion with an analysis of the issues relating to fraud.  For the reasons set forth below, we conclude that respondent has proven fraud for 1988 but has not proven fraud for 1990 or 1991.

Fraud

The addition to tax for fraud under section 6653(b), and its successor penalty under section 6663, are civil sanctions

intended to safeguard the revenue and to reimburse the Government for the heavy expense of investigation and for the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938); Ianniello v. Commissioner, 98 T.C. 165, 183-185 (1992). Respondent has the burden of proving, by clear and convincing evidence, an underpayment for each year and that some part of the underpayment was due to fraud. If respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud and subjected to a 75-percent addition to tax or penalty, unless the taxpayer establishes that some part of the underpayment is not attributable to fraud. See section 6653(b)(2) for 1988 and section 6663(b) for 1990 and 1991.

Respondent's burden with respect to fraudulent intent is met if it is shown that the taxpayer intended to conceal, mislead, or otherwise prevent the collection of taxes known to be owing. See, e.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud may be proved by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. Fraudulent intent may be inferred from various "badges of fraud". Bradford v.

Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Respondent has alleged several items that petitioners omitted from their reported income for the years in issue that result in an underpayment of tax. Respondent also contends that petitioners failed to cooperate and to produce books and records and that such failure is evidence of fraudulent intent.

Respondent contends that petitioners filed a false Form 2119 relating to their gain from sale of 14 Siros when they knew they were not entitled to application of section 1034 to that sale. Section 1034 clearly applies only to property used by a taxpayer as his or her principal residence. The concept of principal residence is neither complicated nor arcane. By 1988, petitioner had been involved in real estate transactions for over 2 years and had earned an M.B.A. degree. He testified that he read the instructions concerning section 1034. In their brief, petitioners do not contend that they were entitled to apply section 1034; they merely argue:

> While perhaps the home at Apricot should have been considered their principal residence and the home at 14 Siros should have been left out of the equation, to take the best advantage under the tax laws is what the Petitioners thought they could legally do. They believed that the intent to make 14 Siros their home, coupled with the actions such as delivery of furniture and so forth, adequately complied with the law relative to Internal Revenue Code sec. 1034.

The phrase "principal residence" is not defined by the Code; however, section 1.1034-1(c)(3)(i), Income Tax Regs., provides

that the determination of whether a property is used by a taxpayer as his principal residence "depends upon all the facts and circumstances in each case, including the good faith of the taxpayer." Generally, for property to be "used by the taxpayer as his principal residence" within the meaning of section 1034(a), that taxpayer must physically occupy and live in the dwelling. Houlette v. Commissioner, 48 T.C. 350, 354 (1967); Stolk v. Commissioner, 40 T.C. 345, 353-356 (1963), affd. 326 F.2d 760 (2d Cir. 1964). See generally Perry v. Commissioner, 91 F.3d 82 (9th Cir. 1996), affg. T.C. Memo. 1994-247, for a recent summary of applicable rules.

For 1988, we have specifically found that petitioners did not occupy 14 Siros as their principal place of residence. We also found that, when he prepared and filed petitioners' return for 1988, petitioner was familiar with the requirements for deferral of gain under section 1034 and knew that petitioners did not qualify for deferral with respect to the gain on the property at 14 Siros, but nonetheless claimed the deferral on the return in order to defeat or avoid the taxes known to be owing on the gain that they realized from sale of that property. In addition, petitioners reported sale of their actual residence, Apricot, as a sale of business property, thereby concealing the identity of their actual residence. We reject the testimony by both petitioners at trial that they actually resided at 14 Siros and that they received rental income from a tenant at Apricot.

Petitioners' explanations are improbable, in view of the sequence of events, and were contradicted by disinterested witnesses. Implausible explanations of this kind are among identified badges of fraud. See Bradford v. Commissioner, supra.

We have also found that petitioner intentionally underreported income from sale of the Malloy property by $65,269 in order to defeat or avoid the payment of taxes known to be owing on that gain. From his testimony and from the entire record, we are satisfied that petitioner had the education and intelligence to understand what was required and that he deliberately falsified his return in order to avoid payment of tax known to be owing. Although we do not believe her trial testimony, we have no evidence that Mrs. Goldberg had the education or experience to know that these transactions were falsely reported. The addition to tax for fraud for 1988 will be sustained only as to petitioner. See Minter v. Commissioner, T.C. Memo. 1991-448; Congelliere v. Commissioner, T.C. Memo. 1990-265.

Our conclusions as to the above two items for 1988 are sufficient to establish an underpayment of tax for that year and to shift to petitioner the burden of showing that any other portion of an underpayment is not due to fraud. Respondent has, however, conceded that certain disallowed expenses do not result in an underpayment due to fraud, and those concessions will affect the final computation.

Our conclusions regarding fraud are also sufficient under section 6501(c)(1) to overcome the bar of the statute of limitations for that year. See Stone v. Commissioner, 56 T.C. 213, 228 (1971). Therefore, it is not necessary for us to discuss whether respondent has proven a substantial omission of income for purposes of section 6501(e)(1).

For 1990 and 1991, respondent bases her determination of fraud on petitioners' failure to report income allegedly embezzled from Kortava and on postponement of reporting income from the vehicle resale business. Respondent has not proven by clear and convincing evidence that petitioner embezzled money from Kortava or that petitioners failed to report money received from Kortava as income with knowledge that the funds were taxable. Although petitioner exercised control over the funds and was high-handed in his use of them, leading to a dispute with Kortava, it is not clear that petitioner intended permanently to deprive Kortava of his funds. Respondent has not disproved petitioners' explanation that they were investing money in real estate and in other businesses in accordance with an agreement with Kortava, as demonstrated by their return of $165,000 of Kortava's money on his demand. See, e.g., Baumgardner v. Commissioner, 251 F.2d 311, 322 (9th Cir. 1957), affg. T.C. Memo. 1956-112; Ishijima v. Commissioner, T.C. Memo. 1994-353. We are not convinced that reporting income in 1991 instead of 1990 was due to fraud.

There is no apparent relationship between the transactions that we determined were fraudulently reported for 1988 and the transactions that were the basis of respondent's determination for 1990 and 1991. Thus, there is no discernible pattern from which fraud can be inferred. As appears from the discussion below, the other items in dispute for 1990 and 1991 would not support a determination of fraud. Respondent's determination under section 6663, therefore, will not be sustained. Respondent's alternative determination of the accuracy-related penalty under section 6662(a) for 1990 and 1991 is discussed below.

Unreported Income--Bank Deposits

Respondent determined during the audit, based on a bank deposits analysis, that petitioners failed to report $48,160 of income on their 1988 return. At trial, respondent introduced a second bank deposits analysis increasing the claim for underreporting to $79,147. While petitioners generally argue that respondent's determination is incorrect, petitioners specifically contend that respondent's analyses do not accurately reflect certain income reported on their 1988 return.

The bank deposits analysis that was prepared during the audit of petitioners' return is not reliable. There is no evidence that this analysis took into account transfers, redeposits, or returned checks. Also, this analysis does not account for the proceeds from petitioners' sale of Analog stock.

The second bank deposits analysis identifies the following amounts as deposits of proceeds from:

| | |
|---|---|
| Rents | $26,617 |
| Interest | 2,504 |
| Dividends | 119 |
| Taxi checks | 7,764 |

The second analysis does not correctly take into account the amounts reported by petitioners.

We conclude that petitioners have unexplained deposits as follows:

| | |
|---|---|
| Unexplained deposits as determined by respondent | $79,147 |
| Less: Income reported by petitioners but not accounted for by respondent: | |
| Rent | (32,338) |
| Interest | ( 855) |
| Dividends | ( 758) |
| Taxi | (11,736) |
| Adjusted unexplained deposits | $33,460 |

Petitioners have failed to provide any other evidence that the unexplained deposits, as determined above, do not constitute unreported income. Thus, respondent's determination, as adjusted above, that petitioners had unreported income will be sustained.

Unreported Income--Like-Kind Exchange

Respondent initially argued that petitioners' transfer of $80,000 from the 14 Siros escrow to Shumin for the downpayment on 29 Hastings and their provision of other amounts necessary for Shumin's purchase of 29 Hastings somehow alter the exchange. Respondent has not argued that petitioners were not repaid for the advances to Shumin.

That petitioners provided funds for Shumin's purchase of 29 Hastings does not change the treatment of the exchange of

properties.  In 124 Front Street, Inc. v. Commissioner, 65 T.C. 6 (1975), the taxpayer owned an option to purchase property that Fireman's Insurance Company (Fireman's) wanted to acquire. Fireman's advanced to the taxpayer the funds to acquire the property so that the taxpayer could exchange the property for property owned by Fireman's.  We held that the transaction was a like-kind exchange and that the advance, which was bona fide, was not boot to the taxpayer.  Id. at 15-16; see also Biggs v. Commissioner, 69 T.C. 905 (1978), affd. 632 F.2d 1171 (5th Cir. 1980).  In the instant case, as in 124 Front Street, Inc., there is no evidence that the advances that were made by petitioners were not bona fide.  Petitioners acquired 29 Hastings in a transaction that will be respected for tax purposes.  See, e.g., Estate of Bowers v. Commissioner, 94 T.C. 582, 590 (1990); Biggs v. Commissioner, supra at 918 (courts have afforded great latitude in structuring exchanges under section 1031).

Section 1031(a) provides the general rule that "No gain or loss shall be recognized on the exchange of property held solely for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment."  Emphasis added.  Petitioners exchanged two pieces of real estate (the Detroit properties and the 8th Street property) for one piece of real estate (29 Hastings) plus the excess cash proceeds.  Cash is not property of like kind to real

estate, and, thus, petitioners' exchange was not solely in kind. Gain must be recognized to the extent of such cash received (boot). See sec. 1031(b).

The excess proceeds must be taken into account as boot because the replacement property, 29 Hastings, cost IEC less than the proceeds available from the disposition of the relinquished property. By using the excess proceeds to increase their equity in 29 Hastings (by reducing the mortgage) instead of receiving the excess proceeds outright, petitioners attempted to avoid treating the excess proceeds as property not of like kind. That petitioners, not IEC, agreed to pay down the mortgage on 29 Hastings is indicative of petitioners' control over the excess proceeds. "'The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it.' * * * [The taxpayer's] failure to receive cash was entirely due to his own volition." Murphy v. United States, 992 F.2d 929, 931 (9th Cir. 1993) (quoting Helvering v. Horst, 311 U.S. 112, 118 (1940)).

Petitioners realized gain of over $176,000 and, thus, must recognize gain on the exchange equal to $36,335.11. Sec. 1031(b).

Unreported Income--Unemployment Compensation

Respondent determined that petitioners failed to report $4,606 of unemployment compensation that petitioner received

during 1988. Petitioners claim that the amount they reported, $1,328, represented unemployment compensation and that the $4,606 amount that respondent claims they failed to report represented disability compensation. Petitioner, however, has provided neither explanation nor corroboration of any alleged disability. Petitioner's testimony was not persuasive. Respondent's determination that the unreported amounts represented taxable unemployment compensation will be sustained.

Unreported Income--Kortava

Respondent determined that petitioners failed to report income received from Kortava during 1990 and 1991. Petitioner received $292,544 and $275,612, in 1990 and 1991, respectively, from Kortava. Petitioner returned $165,000 to Kortava in 1991.

Preliminarily, petitioners contend that respondent's proof at trial and argument on brief do not conform to the notice of deficiency or to the affirmative pleadings. Petitioners note that the statutory notice of deficiency and answer refer to "foreign fund income" as an adjustment to income in the amounts of $220,000 and $233,566 for 1990 and 1991, respectively. The notice of deficiency explains this determination as "Supplemental compensation and bonuses are includable in gross income." Respondent's answer, in alleging fraud, states: "The petitioners fraudulently and with intent to evade income taxes failed to report foreign fund income in the respective amounts of $220,000 and $233,566 during 1990 and 1991 taxable years." Respondent's

argument on this issue on brief is that "petitioners stole $568,156, both concealing and misrepresenting their use of these funds to Kortava, and failing to report most of their embezzlement on their returns."

In the notice of deficiency and at trial, respondent maintained the position that petitioners had failed to report income received from foreign sources. The record does not indicate that petitioners misunderstood respondent's position. In this instance, the evidence that is required to disprove the determination in the notice of deficiency is <u>not</u> different than that required to meet the position taken by respondent at trial. Cf. <u>Estate of Falese v. Commissioner</u>, 58 T.C. 895, 899 (1972). Respondent has not raised a new matter. Respondent has proposed a new theory, merely clarifying or developing the original determination. Respondent does not bear the burden of proof on a new theory. See <u>Estate of Jayne v. Commissioner</u>, 61 T.C. 744, 748-749 (1974).

Petitioners do not contest that Kortava transferred funds in the above-stated amounts to petitioners during 1990 and 1991. Petitioners' position is that their mere receipt of the funds as agents of Kortava does not produce taxable income.

Gross income includes all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion". <u>James v. United States</u>, 366 U.S. 213, 219 (1961) (quoting <u>Commissioner v. Glenshaw Glass Co.</u>, 348 U.S. 426, 431 (1955)).

There can be no doubt that petitioners exercised control over the funds that were deposited in or transferred to their personal accounts. We must decide whether the extent of their control was such that they are taxable on the amounts that were transferred from Kortava in the years of the transfers.

The transfers from Kortava went into two accounts: California Federal account number 6130, in petitioner's name, and California Federal account number 6250, in Coastline's name. Petitioners then transferred these funds to other Coastline accounts and to their own savings account.

Petitioners claim that the funds that were transferred to their personal savings account were payment for petitioners' Mercedes that was sent to Russia and payment for petitioners' interest in Martis Landing and Saddle Rock.

### Mercedes

We have found as a fact that Kortava transferred $20,000 to petitioner as consideration for petitioner's sending his Mercedes to Russia. Petitioner did not report this amount on his 1990 return. Respondent determined that this amount represented unreported income.

When it became apparent that petitioner would not be able to meet the requirements of specific vehicles as contemplated by the agreement between Kortava and petitioner, petitioner sent his personal car, the Mercedes, to Russia. The acquisition expense of the Mercedes was not shown on the Schedule C for 1990 or 1991.

There is no evidence that the Mercedes was ever treated as the property of the Schedule C business. All of the indications are that the Mercedes was the personal car of petitioners. Thus, we conclude that the transaction occurred outside the Schedule C business. Petitioner testified that he paid "about $20,000" for the Mercedes when he purchased it in 1985. His testimony in this respect is not incredible and is not contradicted. Thus, the amount petitioner received in payment for the Mercedes was not in excess of the cost of the Mercedes; therefore, petitioners have no gain from the sale of their car to Kortava and have not failed to report income related to the sale of the Mercedes.

Saddle Rock and Martis Landing

Petitioners claim that their investment in Saddle Rock and Martis Landing was $188,000, consisting, in part, of the following:

| | |
|---|---|
| Loan to Lee Wood | $80,000 |
| Loan to Lee Wood | 50,000 |
| Payment to Topa | 28,529 |
| Payment to Mission Viejo National Bank | 20,000 |
| Delinquent taxes | 8,203 |

Respondent contends that petitioners did not have an investment in these properties because these amounts were paid with funds received from Kortava.

Petitioners claim that $188,000 received from Coastline represents a payment for their interest in Saddle Rock and Martis Landing. We must decide whether Coastline ever owned the properties.

We found as a fact that Coastline was not a party to the sale of Martis Landing. Furthermore, petitioners reported the sale of Martis Landing on their 1991 personal return. The proceeds of the sale of Martis Landing were deposited into petitioner's personal account, California Federal account number 6130. No evidence has been presented that Coastline was an owner of Martis Landing or that Coastline received the proceeds from the sale of Martis Landing. Petitioners never effectuated a transfer of Martis Landing to Coastline; thus, no portion of the money transferred from Coastline's account was in payment for petitioner's interest in Martis Landing.

Petitioners claim that they transferred Saddle Rock to Coastline and that Coastline then sold Saddle Rock to Moeller. Petitioners rely on certain documents, including the following: (1) A Long Form Security (Installment) Land Contract with Power of Sale between petitioners, as vendors, and Coastline, as vendee, notarized on June 21, 1991, and recorded on November 18, 1994; (2) a Grant Deed from petitioners to Coastline dated "as of January 1, 1992" and notarized on November 17, 1994, and filed on November 18, 1994; (3) a Long Form Security (Installment) Land Contract with Power of Sale between Coastline, as vendor, and Moeller, as vendee, dated January 1, 1992, and recorded on November 18, 1994; and (4) a Notice of Supplemental Assessment from the Orange County Assessor showing Coastline as owner of

Saddle Rock due to a change of ownership effective on June 21, 1991.

For purposes of Federal income taxation, a sale occurs upon the transfer of benefits and burdens of ownership, rather than upon the satisfaction of the technical requirements for the passage of title under State law. Derr v. Commissioner, 77 T.C. 708, 723-724 (1981); Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980). The question of when a sale is complete for Federal income tax purposes is essentially one of fact. Baird v. Commissioner, 68 T.C. 115, 124 (1977). The applicable test is a practical one that considers all of the facts and circumstances, with no single fact controlling the outcome. Derr v. Commissioner, supra at 724; Baird v. Commissioner, supra at 124; Deyoe v. Commissioner, 66 T.C. 904, 910 (1976). Generally, a sale of real property is complete upon the earlier of the transfer of legal title or the practical assumption of the benefits and burdens of ownership. Derr v. Commissioner, supra at 724; Baird v. Commissioner, supra at 124; Deyoe v. Commissioner, supra at 910.

Coastline did not receive the benefits and burdens of ownership upon the execution of the contract of sale from petitioners. Coastline was not entitled to possession until the recording of the contract of sale (which occurred November 18, 1994). Risk of loss did not pass until Coastline had possession. Coastline had no obligation to furnish insurance for Saddle Rock

until it gained possession of the property.  Coastline's only responsibility upon the execution of the contract of sale was the payment of real estate taxes.

Coastline also did not have full legal title at the time the contract of sale was executed.  Under California law, delivery and acceptance of a deed passes full legal title.  Cal. Civ. Code, sec. 1056 (West 1982).  We have only the Grant Deed dated "as of January 1, 1992" and notarized on November 17, 1994, in the record.  Even if the deed were effective retroactively to January 1, 1992, Coastline did not have title to Saddle Rock on June 21, 1991, when petitioner transferred $188,000 from Coastline's account to petitioners' personal account.

On June 21, 1991, Coastline was not the owner of Saddle Rock, and, therefore, no portion of the money transferred from Coastline's account was in payment for petitioner's interest in Saddle Rock.

In summary, petitioners have unreported income to the extent of the moneys transferred into their personal accounts and to the extent that moneys in Coastline accounts were used to pay expenses of Saddle Rock and Martis Landing.

In 1991, petitioners returned to Kortava $165,000, representing a portion of the moneys received from him.  This repayment should be taken into account in the parties' Rule 155 computation.

Respondent also determined that petitioners used funds for unidentified and personal expenses of $8,264.64 from Dean Witter account number 37733 and $2,736.23 from Schwab account number 3843. Petitioners, in their response to a proposed finding of fact regarding Schwab account number 37733, claim that certain charges from Budapest and Madrid that are reflected in the proposed finding and on account statements are not personal expenses. Petitioners state on brief that respondent was shown petitioners' passports and that the passports did not reflect travel to Budapest or Madrid. No such evidence was presented at trial, nor was any other evidence presented concerning the actual purpose of these expenditures. Respondent's determination that petitioners failed to report the amounts paid as personal expenditures will be sustained.

Unreported Income--Deeds in Lieu of Foreclosure

Respondent determined that petitioners failed to report income received from their acceptance of Martis Landing and Saddle Rock by deeds in lieu of foreclosure from the Woods.

Preliminarily, petitioners contend that respondent's proof and argument on brief do not conform to the notice of deficiency or the pleadings. Petitioners note that the statutory notice of deficiency and answer refer to "debt extinguishment" as an adjustment to income in the amount of $74,321. The notice of deficiency explains this determination as "The amount of your debt which was cancelled or forgiven is includable in income."

Respondent's argument on this issue on brief is that "petitioners must recognize $82,485 of ordinary income from receipt of deeds in lieu of foreclosure."  Petitioners claim that, because "debt extinguishment" is not an issue in this case, petitioners were not adequately warned of the nature of the deficiency alleged by respondent.

Petitioners had fair warning of respondent's position on this issue.  On brief, petitioners state:  "In preparation for trial, it was first realized that the Respondent was talking about something totally different than debt extinguishment."  Emphasis added.  Petitioners had the opportunity to present pertinent evidence on this issue; therefore, we may fairly consider it.  However, the evidence that is required to disprove the determination in the deficiency notice is different than that required to meet the position taken by respondent at trial.  See Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989); Colonnade Condominium, Inc. v. Commissioner, 91 T.C. 793, 795 n.3 (1988); Estate of Falese v. Commissioner, 58 T.C. 895, 899 (1972).  Thus, respondent bears the burden of proof on this issue.

Respondent contends that petitioners had income from the acceptance of the deeds in lieu of foreclosure, calculated as follows:

| | |
|---|---|
| Fair market value of properties | $1,075,000.00 |
| Less: | |
|     Basis in notes | 130,000.00 |
|     Mortgages assumed: | |
|         Martis Landing | 135,990.00 |
|         Saddle Rock | |
|             Hawthorne loan | 464,300.37 |
|             Topa loan | [1]203,610.12 |
|     Delinquent taxes paid: | |
|         Martis Landing | 4,191.02 |
|         Saddle Rock | 8,203.72 |
|     Mortgage payments: | |
|         Martis Landing | 2,547.38 |
|         Saddle Rock | |
|             Topa loan | 28,529.53 |
|             Mission Viejo National Bank | 20,000.00 |
| Martis Landing selling expenses | 13,958.00 |
| Gain reported on sale of Martis Landing | 10,312.00 |
| | [2]$ 53,357.86 |

[1]Respondent's initial calculation used $184,794.94 as the amount of the Topa loan. The parties have stipulated that the amount of the loan is $203,610.12.

[2] Respondent has conceded the difference between the $74,321 she determined in the notice of deficiency and the $72,173.04, as she calculated using $184,794.94 as the amount of the Topa loan. We adjust the concession to reflect the stipulated amount of the Topa loan set out above.

Petitioners' contention regarding respondent's calculation is that respondent has not proven the fair market values of the properties. Respondent bases the value of the properties on subsequent sales contracts. On October 29, 1991, Martis Landing was sold for $225,000. On January 1, 1992, petitioners signed an agreement to sell Saddle Rock for $850,000. Petitioners have not claimed that these sales were anything other than arm's length nor have they provided any evidence that the fair market values of the properties on June 19, 1991, were substantially different

from the fair market values on the date of the subsequent sales of the properties.

This case is unlike the situation covered by section 1038, where the seller of real property reacquires his property in satisfaction of indebtedness to the seller. In that case, section 1038 provides that no gain or loss shall result to the seller because the seller/mortgagee is reacquiring that which was initially sold to the purchaser/borrower. In this case, petitioners loaned $130,000 and received, through deeds in lieu of foreclosure, property with a net value in excess of $130,000. Petitioners have realized ordinary (because there has been no sale or exchange for purposes of section 1231) income to the extent that the net fair market value of the properties received exceeded their adjusted basis in the debt. See Commissioner v. Spreckels, 120 F.2d 517, 521 (9th Cir. 1941); Pender v. Commissioner, 110 F.2d 477, 478 (4th Cir. 1940).

In our findings of fact, we found that each of the items that respondent used to calculate petitioners' income from the acceptance of the deeds in lieu of foreclosure was paid or reported by petitioners in the amounts stated above. Petitioners have not offered any evidence of other items that would reduce their income from the acceptance of the deeds in lieu of foreclosure. Respondent's determination, in an amount as corrected above, that petitioners had ordinary income from the acceptance of deeds in lieu of foreclosure will be sustained.

Unreported Income--Interest

Respondent determined that petitioners failed to report interest earned on their funds in the name of Shumin. Petitioners have not presented any argument regarding respondent's determination other than to assert, in response to respondent's proposed finding of fact, that "respondent offered no evidence on this issue."

Petitioners bear the burden of proving that respondent's determination is incorrect. Rule 142(a). They failed to offer any proof. Respondent's determination on this issue will be sustained.

Schedule C Income--1990

Respondent determined that petitioners reported as income in 1991 funds that they received in 1990, including approximately $34,544 from Kortava for the business school and $38,000 from Kortava for the vehicle resale business. Petitioners exercised complete dominion and control over these amounts and, as such, have gross income in the amounts we conclude below. See James v. United States, 366 U.S. 213, 219 (1961).

Business School

Petitioners have conceded that the proper year for reporting the business school income is 1990, but petitioners have not conceded the amount of income that should be reported. Petitioners have not presented argument or evidence to show that the amount of respondent's determination, $34,544, is incorrect. Thus, respondent's determination that petitioners' 1990

Schedule C income from operation of the business school be increased by $34,544 will be sustained.  In accord with the parties' agreement, a corresponding reduction will be made in petitioners' 1991 Schedule C income from operation of the business school.

### Vehicle Resale Business

As to the vehicle resale business, on brief petitioners state:  "it does appear possible that at least a portion of the income on the cash basis should have been reported in 1990."  Petitioners admit that $38,000 was received via wire transfer during 1990.

At trial, petitioner testified that he received the wire transfer in 1990 but that, if he had been unable to deliver the cars as specified in the agreement, the money would have been returned to Kortava.  However, the parties modified the agreement so that petitioner did not have to return any of the money.

As a general rule, cash basis taxpayers, such as petitioners, must report income upon its receipt.  Sec. 451(a).  Petitioners' argument appears to be that, although $38,000 was received in 1990, the money was subject to a contractual restriction that prohibited it from being income in 1990.  Respondent's determination is based on the claim of right doctrine.

Income received under a claim of right is taxable in the year received even though the recipient may be under a contingent obligation to return it at a later time.  North Am. Oil Consol.

v. Burnet, 286 U.S. 417, 424 (1932). "The mere fact that income received by a taxpayer may have to be returned at some later time does not deprive it of its character as taxable income when received." Woolard v. Commissioner, 47 T.C. 274, 279 (1966). To avoid the application of the claim of right doctrine, however, the recipient must recognize in the year of receipt an existing and fixed obligation to repay the amount received and must make provisions for repayment. Hope v. Commissioner, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973). A restriction on the disposition or the use of the funds may also prevent the application of the claim of right doctrine. Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 209 (1990). Petitioners have not met these exceptions.

Petitioner was under a contingent, not a fixed, obligation to repay the funds to Kortava pursuant to their agreement. Furthermore, while Kortava may have had in mind a restriction on the use of the funds, petitioner deposited the $38,000 in one of his personal accounts, not in one of Coastline's accounts. Respondent's determination that petitioners failed to report $38,000 that was received from Kortava during 1990 will be sustained. In accord with the parties' agreement, a corresponding reduction will be made in petitioners' 1991 Schedule C income from operation of the vehicle resale business.

Schedule C Expenses--1991

On their 1991 Schedule C, petitioners claimed expenses relating to a vehicle resale business and a business school.

Respondent disallowed $13,188 of expenses related to the vehicle resale business and $28,417 of expenses related to the business school, based on her position that petitioners did not pay the claimed expenses with their own funds.  Petitioners contend that they are entitled to these deductions because they reported the corresponding income from these activities on their 1991 Schedule C.  We have concluded that petitioners exercised the requisite dominion and control such that the funds received from Kortava for the vehicle resale business and the business school are includable in petitioners' gross income.  Thus, the expenses that petitioners incurred in the operation of the Schedule C businesses that have been properly substantiated and that are ordinary and necessary are deductible by them.

### Vehicle Resale Business

To substantiate disallowed deductions claimed in relation to the vehicle resale business, petitioners introduced an exhibit that included various receipts and their 1991 tax return. Petitioner also testified at trial as to the existence of the various expenses.

The information contained on a tax return is not proof of the amount of deductions contained therein.  Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979).  Although petitioner testified to the contrary, the exhibit introduced at trial did not contain receipts for gas or office expense.  We require more than petitioner's unsubstantiated and unverified testimony as to the existence of gas expense and office expense.  Wood v.

Commissioner, 338 F.2d 602, 605 (9th Cir. 1964), affg. 41 T.C. 593 (1964).

One repair receipt totaling $125 and marked paid is included in petitioners' exhibit. This additional amount will be allowed.

As for additional vehicle expenses, we cannot determine from the receipts in evidence that petitioners are entitled to any deductions other than those already allowed by respondent. Petitioners claimed that they did not include the value of their Mercedes that they shipped to Russia as an expense when they were preparing their 1991 Schedule C. Petitioner testified that the Mercedes was worth $20,000 when it was shipped to Russia. Kortava testified that the Mercedes was worth approximately $10,000. The damage report that was completed before shipping notes that the Mercedes had several minor scratches and a broken headlight, as well as additional damage. No additional evidence was presented to show the value of the 1984 Mercedes. We found as a fact that petitioners received $20,000 in 1990 from Kortava as consideration for petitioner's sending his Mercedes to Russia and that petitioners did not recognize a gain from this transaction. The record does not provide any evidence that the Mercedes ever became the property of Coastline. Thus, the transaction took place outside of the Schedule C vehicle resale business, and petitioners are not entitled to a deduction on their 1990 Schedule C for the expense of the Mercedes.

Business School

Petitioners claimed $28,417 of expenses related to the business school on their 1991 Schedule C. Respondent disallowed all of the claimed deductions.

We found as a fact that petitioners paid at least $20,033 of expenses associated with the AESI contract, including $9,240 to AESI and $10,793 for gasoline, travel, lodging, meals, and entertainment. Petitioners have failed to substantiate any additional expenses. We must thus determine whether the substantiated expenses are ordinary and necessary and, therefore, deductible.

Section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". "Ordinary" has been defined as that which is "normal, usual, or customary" in the taxpayer's particular trade or business. Deputy v. du Pont, 308 U.S. 488, 495 (1940). The expense need not be one common for the particular taxpayer, but instead one that is not rare in the taxpayer's business. See Welch v. Helvering, 290 U.S. 111, 114 (1933). The substantiated expenses included "normal" expenses for the conduct of a business school abroad, including travel to and from Russia for petitioner and the faculty; the expenses for AESI's building the curriculum and locating the faculty; the food, meals, and lodging for the faculty in Russia; and the travel, food, meals, and lodging for the top students from Russia who came to the United States after the school.

"Necessary" has been construed to mean "appropriate" or "helpful", not "indispensable" or "required". Ford v. Commissioner, 56 T.C. 1300, 1306 (1971), affd. 487 F.2d 1025 (9th Cir. 1973). It is sufficient if "there are also reasonably evident business ends to be served, and the intention to serve them appears adequately from the record." B. Manischewitz Co. v. Commissioner, 10 T.C. 1139, 1145 (1948). The substantiated expenses were also necessary, in that they were incurred with the intention of serving the business end, mainly the conduct of a business school in Russia.

Petitioners are entitled to deduct $20,033 as ordinary and necessary expenses of the business school on their 1991 Schedule C.

Unreported Income--Chorny

Respondent determined that petitioners failed to report Schedule C income of $20,472 and $9,250 in 1990 and 1991, respectively.

At trial, petitioner testified that the payments received from Chorny represented loan repayments. As evidence of the debt, petitioners offered reproductions of checks payable to Chorny or Margarita Chorny.

We are not persuaded by the checks payable to the Chornys that Chorny was indebted to petitioner or that the checks petitioner received during 1990 and 1991 from Chorny were not includable in petitioners' income. At the trial of this case,

Chorny could not recall whether petitioner lent him money during 1990 or 1991 nor could he recall whether he paid money to petitioner for any reason during 1990 or 1991. Petitioner's explanation at trial about the existence of loans is not credible. For example, petitioner stated that he gave to Chorny a $9,000 check on September 20, 1991, representing a short-term loan that Chorny paid back shortly thereafter. The $9,000 check that petitioners received from Chorny was dated September 2, 1991.

Petitioners have not established by a preponderance of the evidence that the checks from Chorny represented loan repayments. Thus, respondent's determination that petitioners failed to report $20,472 and $9,250 in 1990 and 1991, respectively, as Schedule C income from real estate consulting activities will be sustained.

15 Hastings--Option Payment

Respondent determined that petitioners failed to report on their 1991 return the $10,000 option fee that was received from the Woods.

As part of the lease option agreement for 15 Hastings, petitioners received an option fee from the Woods in the amount of $10,000. This amount was deposited with Escrow Masters on November 3, 1989. The parties have agreed that the option fee was available at any time following the consummation of the option agreement. On December 1, 1989, petitioners withdrew the

option fee from their account at Escrow Masters and deposited it into California Federal account number 502396. The Woods decided not to exercise their option on March 7, 1991.

Respondent argues that proceeds from binding legal options are not taxed until the option is exercised or lapses. Petitioners contend that the $10,000 was received by petitioners in 1989 and was taxable in the year of receipt.

Petitioners rely on Estate of Gordon v. Commissioner, 17 T.C. 427 (1951), affd. 201 F.2d 171 (6th Cir. 1952). In Estate of Gordon, a $25,000 "option" payment was taxable income to the taxpayer-decedent in the year of receipt under a claim of right. In Estate of Gordon, the decedent had inherited a theater and business property from her husband. A man was interested in acquiring the property and negotiated two instruments with the decedent. The purchase price was $125,000, and decedent received $25,000 initially and interest was to be computed on the balance of the purchase price, with one of the instruments requiring quarterly interest payments. The lessee was given the privilege of purchase at any time at the expiration of 6 months after the death of the decedent and undertook the insurance and real estate tax responsibilities. No outright sale was accomplished because the lessee was not bound to purchase the property.

The present situation is distinguishable from that in Estate of Gordon. We incorporate herein the reasoning of the Court of Appeals for the Third Circuit when it distinguished the option in Estate of Gordon from true options:

> Again any analogy of this case to the present one fails.  The time during which the option could be exercised was largely uncertain--at any time six months after the owner's demise running the term of the lease of twenty-five years.  The primary purpose seemed to be to provide an elderly widow with an income for her lifetime and it was held in effect, that as such, the $25,000 payment was to be regarded as rent or income in advance and hence was includable in her taxable income when she received it.  [Commissioner v. Dill Co., 294 F.2d 291, 299 (3d Cir. 1961), affg. 33 T.C. 196 (1959).]

In the present case, the option term was certain, expiring in June 1991.  The primary purpose of the option payment was to allow the Woods time to arrange funds for a downpayment.

For cash method taxpayers, such as petitioners, section 451(a) provides that an item of income shall be included in gross income in the taxable year in which it is received by the taxpayers.  One exception to this rule of recognition is that, when it cannot be determined whether payments received will, at some future date, represent income or a return of capital, they are not taxed until their character becomes fixed.  Burnet v. Logan, 283 U.S. 404, 413 (1931); Dill Co. v. Commissioner, 33 T.C. 196, 200 (1959), affd. 294 F.2d 291 (3d Cir. 1961); Virginia Iron Coal & Coke Co. v. Commissioner, 37 B.T.A. 195, 198 (1938), affd. 99 F.2d 919 (4th Cir. 1938).  Respondent argues that the option payment received by petitioners falls within this exception.

The deferral of the taxability of option payments is based on two considerations:  (1) The grantor of an option must wait until the option is exercised or lapses to determine whether the

proceeds for it are reportable as taxable income or as a nontaxable return of capital and (2) if the option proceeds are income to the grantor of the option, the character of the income as capital or ordinary must be determined. See Old Harbor Native Corp. v. Commissioner, 104 T.C. 191, 200 (1995). These considerations remain even though the grantor retains the option amount whether or not the option is exercised. See Hicks v. Commissioner, T.C. Memo. 1978-373. Petitioners, although they had control over and had unfettered use of the $10,000 in 1989, had income in the year the option lapsed, 1991.

15 Hastings--Lease Versus Sale

We now must decide whether the "Lease Option" executed on November 1, 1989, and the "Real Estate Purchase Option" executed on November 3, 1989, effected a sale or a lease with an option to buy. If we decide that the agreements effected a sale, we must then decide the proper characterization of the payments received by petitioners and the expenses claimed by petitioners.

Respondent argues that petitioners mischaracterized the agreement by reporting the related items as though the agreement were a lease instead of a sale. Petitioners contend that they properly characterized the transaction as a lease with an option. In this instance, we are not required to decide which of the two agreements, the Lease Option or the Real Estate Purchase Option, represented the bargain between petitioners and the Woods.

Whether a sale is complete for Federal tax purposes depends on all of the facts and circumstances. Derr v. Commissioner, 77

T.C. 708, 724 (1981); <u>Baird v. Commissioner</u>, 68 T.C. 115, 124 (1977); <u>Clodfelter v. Commissioner</u>, 48 T.C. 694, 700-701 (1967), affd. 426 F.2d 1391 (9th Cir. 1970).  We consider the following factors in deciding whether a sale has occurred:  (1) Whether the seller transferred legal title; (2) whether the benefits and burdens of ownership passed to the buyer; (3) whether the owner had a right under the agreement to require the other party to buy the property; and (4) how the parties treated the transaction. <u>Grodt & McKay Realty, Inc. v. Commissioner</u>, 77 T.C. 1221, 1237-1238 (1981); <u>Derr v. Commissioner</u>, <u>supra</u> at 724; <u>Baird v. Commissioner</u>, <u>supra</u> at 124; <u>Merrill v. Commissioner</u>, 40 T.C. 66, 74 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964); <u>Haggard v. Commissioner</u>, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956).

### 1.  Title Passage to the Woods

While not a single determinative factor, passage of title is an important consideration.  <u>Harmston v. Commissioner</u>, 61 T.C. 216, 229 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976). Title to 15 Hastings never passed to the Woods.

### 2.  Benefits and Burdens to the Woods

To decide whether the Woods acquired the benefits and burdens of ownership in 15 Hastings, we look to whether the Woods:  (1) Bore the risk of loss; (2) were obligated to pay all taxes, assessments, and charges against the property; (3) had the duty to maintain the property; (4) were responsible for insuring the property; (5) had the right to possess the property; (6) had

the right to improve the property without the sellers' consent; and (7) had the right to obtain legal title at any time by paying the balance of the full purchase price. Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238.

In this case, the Woods had the right to possess the property, the right to obtain legal title by paying the balance of the full purchase price, and the duty to maintain the property and to pay insurance costs and taxes (under one agreement). The Woods did not bear the risk of loss. This factor weighs in favor of the agreement's being treated as a sale.

### 3. Compelling the Exercise of the Option

Under California law, an instrument is a contract of sale if the optionee has an obligation to buy that the owner can enforce by specific performance. Welk v. Fainbarg, 255 Cal. App.2d 269, 63 Cal. Rptr. 127, 132-133 (1967). Neither the Lease Option nor the Real Estate Purchase Option provided that petitioners could force the Woods to purchase 15 Hastings.

### 4. Intent of the Parties

Petitioner testified that title to 15 Hastings was never transferred to anyone. Petitioners treated the agreement with the Woods as a lease on their 1990 return. Mr. Wood testified that he and Mrs. Wood were not renting 15 Hastings. Mr. Wood classified the transaction, however, as a lease/option purchase contract. Mrs. Wood said the agreement was initially contemplated as a lease option. Mrs. Wood testified that their

original intent was to purchase 15 Hastings, but they could not get the funds together for the downpayment. Mrs. Wood said the agreement was then converted to a straight month-to-month lease. The testimony given by the parties as to the agreement is consistent with treating the agreement as a lease option. Although the Woods wished to purchase 15 Hastings, the agreement gave them the option of purchasing the property if they could sell their home and get the funds for the downpayment on 15 Hastings. Because the Woods were in the midst of a divorce, Mrs. Wood needed a place to live; thus, the lease option agreement met the intention of the parties to the agreement.

Respondent also argues that the execution of the $232,000 note was in essence a downpayment by petitioners and that the note is evidence of a sale. However, under a consideration of all of the facts and circumstances, we do not conclude that this factor is controlling.

In summary, the passage of benefits and burdens of ownership to the Woods in the absence of title, of an enforceable land sale contract, and of intent to effect an immediate sale does not give us grounds for treating the agreement between petitioners and the Woods as anything other than a lease option agreement.

Unreported Income--Clerical Fee

Respondent determined that, in 1991, petitioners received a clerical fee in the amount of $535 from Mr. Wood. Petitioners did not present any evidence to contradict respondent's

determination.  Mr. Wood testified that, to the best of his recollection, this check represented payment to petitioner for expenses and time incurred by petitioner in helping Mr. Wood's law firm with a case.  Absent any evidence to the contrary, respondent's determination that petitioners failed to report $535 of taxable income in 1991 will be sustained.

Section 6651(a)(1) Addition to Tax

Respondent determined that petitioners are liable for the section 6651(a) addition to tax for 1990 and 1991.  Section 6651(a)(1) imposes an addition to tax for failure to file timely a return, unless the taxpayer establishes that the failure to file did not result from "willful neglect" and that the failure was due to "reasonable cause".  "Willful neglect" has been interpreted to mean a conscious, intentional failure or reckless indifference.  United States v. Boyle, 469 U.S. 241, 245-246 (1985).  "Reasonable cause" requires taxpayers to demonstrate that they exercised ordinary business care and prudence and were nonetheless unable to file a return within the prescribed time. Id. at 246; sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  The addition to tax equals 5 percent of the tax required to be shown on the return for the first month, with an additional 5 percent for each additional month or fraction of a month during which the failure to file continues, not to exceed a maximum of 25 percent. Sec. 6651(a)(1).

Petitioners' 1990 return was received by the Laguna Niguel District Office on October 18, 1991. Petitioners' 1991 return was received by the Laguna Niguel District Office on October 15, 1992.

Respondent contends that the extensions of time to file that were obtained by petitioners are invalid because petitioners failed to estimate properly the tax that was unpaid as of the date prescribed for filing the return. No payments were included with the requests for extensions. Petitioners bear the burden of proving that respondent's determination was incorrect. Rule 142(a); Cluck v. Commissioner, 105 T.C. 324, 339 (1995). Petitioners have failed to produce evidence that their extension requests properly estimated the tax due, and we sustain respondent's determination that petitioners are liable for the section 6651(a)(1) addition to tax for 1990 and 1991.

Section 6662(a) Penalty

For 1990 and 1991, section 6662(a) imposes a penalty in an amount equal to 20 percent of the underpayment of tax attributable to one or more of the items set forth in section 6662(b). Respondent asserts that the entire underpayment of petitioners' tax was due to negligence or intentional disregard of rules or regulations. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972).

"Negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. "Disregard" includes any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

The section 6662 accuracy-related penalty does not apply with respect to any portion of an underpayment if it is shown that there was reasonable cause for such portion and that petitioners acted in good faith with respect to such portion. Sec. 6664(c)(1). The determination of whether petitioners acted with reasonable cause and in good faith depends upon the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have not established reasonable cause or good faith reliance to excuse themselves from the penalties for negligence or intentional disregard of rules or regulations. See Mack v. Commissioner, T.C. Memo. 1995-482. Petitioners have presented no evidence that their failure to file timely or to report their income properly in 1990 or 1991 was due to anything other than negligence or disregard of the tax laws. See Rapp v. Commissioner, 774 F.2d 932, 935 (9th Cir. 1985).

Petitioners' failure to maintain and to produce reliable records of their taxi business also supports a conclusion of negligence. Crocker v. Commissioner, 92 T.C. 899, 917 (1989); Schroeder v. Commissioner, 40 T.C. 30, 34 (1963). Thus,

respondent's determination that petitioners are liable for the accuracy-related penalty for 1990 and 1991 will be sustained.

Mrs. Goldberg is not excused from the negligence addition to tax and penalties for 1990 and 1991 solely because of her failure to read petitioners' returns or her reliance on petitioner for the accuracy of the returns.  Failure to read a return and blind reliance on another for the accuracy of a return are not sufficient bases to avoid liability for negligence.  See Bollaci v. Commissioner, T.C. Memo. 1991-108 (citing Bagur v. Commissioner, 66 T.C. 817, 823-824 (1976), remanded on other grounds 603 F.2d 491 (5th Cir. 1979)).  Taxpayers have a duty to read a return and to make sure all items are included.  Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), affd. 651 F.2d 1233 (6th Cir. 1981) (citing Bailey v. Commissioner, 21 T.C. 678, 687 (1954)).

To reflect the foregoing and the concessions by the parties,

Decision will be entered

under Rule 155.